**HEARTHSHIRE BRAESWOOD PLAZA LIMITED PARTNERSHIP, SMP Med Center Partners Limited, and James M. Birney, Appellants,**

v.

**BILL KELLY COMPANY, Appellee.**

No. B14–92–00509–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 4, 1993.
Rehearing Denied April 8, 1993.

William K. Andrews, Houston, for appellants.

Stephen A. Mendel, Daryl L. Moore, Houston, for appellee.

Before MURPHY, CANNON and ROBERT E. MORSE (sitting by designation), JJ.

## OPINION

CANNON, Justice.

This is an appeal from the trial court's order denying appellants' pleas in abatement and motions to stay litigation and compel arbitration. The order of the trial court is reversed in part and affirmed in part.

The appellants in this case are: Hearthshire Braeswood Plaza Limited Partnership (Hearthshire), owner of an apartment complex known as the Gardens of Braeswood (the Gardens); James Birney (Birney), a limited partner of and agent for Hearthshire; and SMP Med Center Partners, Ltd. (SMP), a limited partnership and owner of the Braesbrook Landing Apartments (the Landing). Birney is also an agent for SMP. The appellee is Bill Kelly Company (Kelly), a sole proprietorship owned by Mr. Bill Kelly (Mr. Kelly). Mr. Kelly's company renovates apartment complexes.

In 1991, Hearthshire and Kelly entered into two contracts concerning renovation work on the Gardens, one on January 21, 1991 and one on March 28, 1991. Each

contract contained an arbitration clause which provided, in pertinent part:

All claims or disputes between the Contractor and the Owner arising out or relating to the Contract, or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise and subject to an initial presentation of the claim or dispute to the Architect as required under Paragraph 10.5.[1]

Subsequently, disputes arose between the parties. Kelly claimed it fully performed under both contracts, but that Hearthshire only paid for the January contract. Hearthshire claimed the work performed by Kelly was unsatisfactory. On December 13, 1991, Hearthshire filed Demands for Arbitration with the American Arbitration Association (AAA) in order to resolve its disputes with Kelly. The demands requested arbitration under the January contract and the March contract. The cases were given two separate case numbers by the AAA. Kelly objected to arbitration claiming that it was unavailable to Hearthshire because: (1) Hearthshire did not comply with paragraph 10.5; (2) certain claims asserted by Hearthshire were not arbitrable; and (3) Hearthshire had failed to give proper notice under the Texas Deceptive Trade Practices Act. None of the reasons asserted by Kelly at that time, concerned fraud in the inducement of the contract or fraud in the inducement of the arbitration provision.

During the following two month period, the parties corresponded with the AAA concerning the arbitrability of the case. This was done at the request of the AAA. In one of the letters to the AAA, Kelly asserted that arbitration was not available to Hearthshire because the March contract had been procured through fraud. In that same letter, Kelly conceded that certain issues in the January contract were potentially arbitrable.

On January 24, 1992, Kelly filed a lawsuit seeking a declaratory judgment that arbitration was unavailable to Hearthshire, asserting the same objections it had initially made to the AAA. In the petition, Kelly also asserted claims against Hearthshire and Birney for breach of contract, foreclosure of a mechanic and materialman's lien, suit on a sworn account, quantum meruit, fraud, promissory estoppel, negligent misrepresentation, and grossly negligent misrepresentation. The basis for these last four claims was Kelly's contention that it had agreed to perform and finance the renovation work at the Gardens because Hearthshire and Birney had allegedly promised Kelly that it would receive the $4.5 million renovation project on the Landing. Kelly claimed that in reliance on this representation, it financed and completed the renovation work at the Gardens, but never received a contract to renovate the Landing.

Hearthshire and Birney filed a Plea in Abatement and Original Answer on February 28, 1992. On March 9, 1992, Kelly amended its petition to add SMP to the suit, asserting against it the same claims which had asserted against Hearthshire and Birney. On March 11, 1992, Hearthshire and Birney filed a Motion to Stay Litigation and Compel Arbitration and a brief in support of the motion. On March 27, 1992, SMP filed its Plea in Abatement, Motion to Stay Litigation and Compel Arbitration and Original Answer. On April 4, 1992, Kelly filed its response to the motions to stay litigation and compel arbitration, and filed an amended petition. In these

---

1. Paragraph 10.5 states:

The Architect will interpret and decide matters concerning performance under and requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect will make initial decisions on all claims, disputes or other matters in question between the Owner and Contractor, but will not be liable for results of any interpretations or decisions rendered in good faith. The Architect's decisions in matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents. All other decisions of the Architect, except those which have been waived by making or acceptance of final payment, shall be subject to arbitration upon the written demand of either party.

documents, Kelly alleged that appellants had fraudulently induced Kelly to enter into the arbitration provision in the March contract. Kelly asserted that it entered into the March contract because Hearthshire and Birney represented that Project Controllers, Inc. (PCI) would initially resolve all disputes between the parties. Kelly based this assertion on the fact that while PCI was referred to in the contract as "project manager", it acted as architect for other purposes, and paragraph 10.5 stated that all disputes would be initially referred to the architect. Kelly had worked with PCI before and knew it to be qualified. Kelly alleged that this representation induced it to enter into the arbitration provision. Appellants claimed that there was no architect on the project and therefore, the mandates of paragraph 10.5 were inapplicable. As to the January contract, Kelly also claimed that it was not enforceable because Hearthshire had not signed it.

On April 7, 1992, the trial court denied appellants' motions without a hearing. On April 20, 1992, the trial court entered an order denying appellants' pleas in abatement and motions to stay litigation and compel arbitration. The court further ordered that the arbitration proceedings under the January and March contracts be stayed. The trial court did not explain the reasons for, or set out specific grounds for its ruling. Further, che trial court did not file findings of fact and conclusions of law. Appellants appeal from that order.

In their third point of error[2], appellants contend that there was no evidence or insufficient evidence to support the trial court's finding of fraud in the inducement of the contract as a whole.

■ In a standard appeal when the appellant raises "no evidence" and "factual insufficiency" points, the appellate court reviews the "no evidence" point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). If the court finds there is some evidence, it proceeds then to consider the insufficient evidence point.

*Id.* Though appellants style this point of error and others as "no evidence" and "insufficient evidence," the proper standard of review in an appeal from an interlocutory order concerning a motion to stay litigation and compel arbitration is simply "no evidence." *Wetzel v. Sullivan, King & Sabom, P.C.*, 745 S.W.2d 78, 79 (Tex.App.— Houston [1st Dist.] 1988, no writ); *Gulf Interstate Eng'g v. Pecos Pipeline*, 680 S.W.2d 879, 881 (Tex.App.—Houston [1st Dist.] 1984, writ dism'd). Therefore, we will review this point of error and the others similarly styled under the "no evidence" standard of review.

■ In reviewing "no evidence" or legal sufficiency points, the court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding under attack, and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). When, as in this case, there are no findings of fact and conclusions of law, we must affirm the judgment if there is evidence to support it upon any legal theory asserted by the prevailing party. *Gulf Interstate*, 680 S.W.2d at 881.

Article 224 of the Texas General Arbitration Act states, in pertinent part:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or equity for the revocation of any contract. A court shall refuse to enforce an agreement or contract provision to submit a controversy to arbitration if the court

---

**2.** Appellants have listed their points of error in outline form, 1.A. through 1.L. For clarity, we have renumbered the points as numbers one through twelve.

finds it was unconscionable at the time the agreement or contract was made. TEX.REV.CIV.STAT.ANN. art. 224 (Vernon Supp.1992).

In its suit for declaratory judgment, Kelly maintained that arbitration was unavailable to appellants because they had fraudulently induced Kelly to enter into the contract as a whole, and that under article 224, this was sufficient to deny appellants' demands for arbitration. Kelly based this contention on its claim that appellants had allegedly represented to Kelly that it would receive the $4.5 million renovation project on the Landing if Kelly financed and completed the renovations on the Gardens. Kelly alleged that it fulfilled its end of the bargain, but that appellants did not give Kelly the Landing renovation project as promised. Kelly claimed that the representation as to the $4.5 million project induced it to enter the contract, and that this was done fraudulently.

In order to prove fraud, Kelly had to show that: (1) a material representation was made; (2) the representation was false; (3) when appellants made it they knew it was false, or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it should be acted upon by Kelly; (5) Kelly acted in reliance upon the representation; and (6) Kelly thereby suffered injury due to its reliance on the representation. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977); *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc.*, 703 S.W.2d 209, 213–14 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Further, because the representation involved a promise to do an act in the future, i.e., allow Kelly to renovate the Landing in the future, Kelly also had to prove that at the time the representation was made, appellants had no intention of performing the act. *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex.1992); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 433 (Tex.1986). The evidence in the record in support of Kelly's contentions consists of two affidavits of

Mr. Kelly. One of these affidavits is attached to Kelly's response to appellants' motions to stay litigation and compel arbitration. The other affidavit is attached to Kelly's second amended petition. Besides these affidavits and a copy of the contract, the other documents in the record are pleadings, motions, and responses filed by the parties.

■ Kelly urges this court to accept the affidavits **and** their pleadings as evidence in support of the fraud claim. Kelly argues that because appellants filed pleas in abatement, the trial court was required to accept as true the factual allegations of fraud in the inducement as set forth in the second amended petition, unless those allegation were disproved. *See Seth v. Meyer*, 730 S.W.2d 884, 885 (Tex.App.—Fort Worth 1987, no writ). We refuse to accept Kelly's argument for three reasons: (1) the appellants did not simply file pleas in abatement, rather the pleas in abatement were supplanted by, or at best, coupled with appellants' motions to stay litigation and compel arbitration; (2) the burden of proof is on the party resisting arbitration; and (3) the standard suggested by Kelly for plea in abatement review is incompatible with the "no evidence" standard of review also advocated by Kelly.

■ A fair reading of the motions filed by appellants clearly shows that they were not mere pleas in abatement. The substance of the motions is a request for the trial court to stay the litigation and compel arbitration. The plea in abatement filed by the appellants Hearthshire and Birney was filed with their original answer as provided for under the Texas Rules of Civil Procedure. *See* TEX.R.CIV.P. 85. Later, they filed their motion to stay litigation and compel arbitration. SMP, who was later added as a defendant by Kelly, simply lumped the plea in abatement in with their original answer and motion to stay litigation and compel arbitration. If the relief sought by appellants had concerned only a plea in abatement, this court would not have jurisdiction over this appeal. An order overruling a plea in abatement is inter-

locutory in nature because the order does not finally resolve the controversy. 745 S.W.2d 78, 79; *City of Arlington v. Texas Elec. Serv. Co.*, 540 S.W.2d 580, 582 (Tex. Civ.App.—Fort Worth 1976, writ ref'd n.r.e.). However, we have jurisdiction in this case because the trial court's order did not just overrule a plea in abatement, rather the order required the parties to litigate and stayed the arbitration proceedings. TEX.REV.CIV.STAT.ANN. art. 238–2, § A(1) and (2) (Vernon 1973). Because the relief sought by appellants and denied by the trial court was not solely for abatement, the cases cited by Kelly in support of its plea in abatement argument are inapplicable.

■ The cases cited by Kelly, supporting the argument that the trial court had to accept its pleadings as true unless appellants disproved those allegations, do not involve arbitration.[3] The burden of proof in a plea in abatement action is very different from the burden of proof in an action where a party is seeking to avoid arbitration.

■ Arbitration is favored by the courts of this state. *Manes v. Dallas Baptist College*, 638 S.W.2d 143, 145 (Tex. App.—Dallas 1982, writ ref'd n.r.e.); *Carpenter v. North River Ins. Co.*, 436 S.W.2d 549, 553 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). Under the Texas General Arbitration Act, an agreement to arbitrate is valid unless grounds exist for revocation. TEX.REV.CIV.STAT. ANN. art. 224 (Vernon Supp.1992). As stated in *Gulf Interstate*, fraud and unconscionability are **defenses** to the enforcement of an arbitration provision under article 224. *Gulf Interstate*, 680 S.W.2d at 881. Since the law favors arbitration, and article 224 sets up fraud and unconscionability as defenses, the burden of proof is on the party seeking to avoid arbitration. *See Id.* Because Kelly was the party seeking to avoid arbitration, it was Kelly's burden to prove fraud. Therefore, the trial court was not required to accept the allegations in Kelly's pleadings as true.

■ Finally, we cannot accept the plea in abatement standard of review suggested by Kelly because it is inconsistent with the "no evidence" standard of review also advocated by Kelly. Under the plea in abatement standard, Kelly argues that the trial court should have accepted Kelly's pleadings as true since appellants failed to disprove them. Kelly's argument on appeal suggests that we are required to do the same; however, Kelly also argues that this court should use the "no evidence" standard. Under this standard, we are required to consider only the evidence which supports the trial court's order, i.e. Kelly's evidence, and to disregard all evidence to the contrary, i.e. appellants' evidence. If we used both standards, we would have to accept the allegations in Kelly's pleadings as true, and ignore any evidence in the record that contradicted those pleadings. In other words, Kelly would automatically prevail on appeal because its contentions would be accepted and any evidence brought by appellants would be ignored.

It is apparent from our analysis that the plea in abatement argument proposed by Kelly is flawed. Therefore, we hold that Kelly's pleadings are not to be taken as evidence and the proper standard of review in this appeal is the "no evidence" standard.

■ Since we have determined that Kelly's pleadings do not constitute evidence in this case, we now look to the two affidavits of Mr. Kelly to determine if they are sufficient to sustain Kelly's claim of fraud in the inducement of the contract as a whole.

The affidavit which is attached to Kelly's second amended petition swears to the allegations in the petition concerning Kelly's claim for sworn account. There is nothing in that affidavit to support Kelly's fraud claim. Therefore, the affidavit attached to Kelly's response to appellants' motions to stay litigation and compel arbitration is the

3. *Seth v. Meyer,* 730 S.W.2d 884 (Tex.App.—Fort Worth 1987, no writ); *Flowers v. Steelcraft* *Corp.,* 406 S.W.2d 199 (Tex.1966).

only document that speaks to Kelly's allegation that it was induced to enter the contract relating to the Gardens because appellants fraudulently represented that Kelly would be given the $4.5 million renovation project on the Landing. Now, we must look to the affidavit and determine whether it contains some evidence on each of the elements of fraud.

Paragraphs eleven through thirteen contain statements regarding the Landing. In these paragraphs, Mr. Kelly states that:

1. Birney requested that Kelly perform work on the Landing, a complex owned by SMP.

2. Kelly was not allowed to perform the work on the Landing.

3. The negotiations with Birney for the Landing project were in his individual capacity and/or as president of the general partner for SMP.

4. There was no written agreement between the parties as to the Landing project, and therefore Kelly is not required to arbitrate disputes regarding the Landing.

Viewing these statements in the light most favorable to the trial court's order, Kelly has failed to present sufficient evidence to support its claim of fraud in the inducement of the contract as a whole. The only evidence in this affidavit supporting a fraud allegation is Mr. Kelly's statements that Birney told Kelly that it would receive the Landing project, and that Kelly did not receive the project. There is no evidence that: (1) Birney knew the statement was false when it was made; (2) Birney intended Kelly to rely on the statement; (3) Kelly did in fact enter into the contracts for the Gardens because of this statement; or (4) at the time the representation was made, appellants did not intend to give Kelly the Landing project. Therefore, we hold that there is no evidence of fraud in the inducement of the contract as a whole. Kelly failed to present evidence on each of the elements of fraud. If the trial court based its decision on fraudulent inducement of the contract as a whole, it committed error because there is no evi-

dence to support that contention. Appellants' third point of error is sustained.

In their first point of error, appellants allege that fraud in the inducement of the contract as a whole cannot be used as grounds to defeat an arbitration clause. Because we have determined that there was no evidence to support fraudulent inducement of the contract as a whole, it is unnecessary for us to decide this point of error. Whether a claim of fraudulent inducement of the contract as a whole is sufficient to defeat an arbitration provision is irrelevant in this instance because Kelly failed to present evidence of such fraud.

Since the trial court did not specify the reasons for its ruling, we must proceed with our review of appellants' remaining points to determine if there is any legal theory to support the trial court's decision. *Id.*

■ Appellants argue, in their fifth point of error, that there was no evidence or insufficient evidence to support the finding of fraud in the inducement of the arbitration provision. Again, using only the "no evidence" standard as set out above at length, we hold that there is no evidence to support a finding of fraud in the inducement of the arbitration provision.

As we have already discussed, only the affidavit attached to Kelly's response to the motions to stay litigation and compel arbitration contains evidence of any type of fraud. We will now examine the affidavit to determine whether it contains evidence on the elements of fraud as set out above, as the claim relates to fraud in the inducement of the arbitration provision. Kelly's argument as to this claim of fraud states that it was fraudulently induced to enter into the arbitration provision because appellants falsely represented the PCI would act as the initial arbitrator for all disputes between the parties. The pertinent parts of Kelly's affidavit state, as summarized:

1. At the request of PCI, Kelly agreed to renovate the Gardens.

2. All negotiations were with Birney, and PCI participated in the negotiations.

3. The contracts were standard owner/contractor agreements. These types

of agreements generally provide that an architect will oversee the work; however, it is not uncommon that another party will be substituted in the architect's place and carry out his duties.

4. Hearthshire substituted PCI as the entity to perform the architect's duties. PCI performed numerous duties, assigned under the terms of the contract, to the architect.

5. When Hearthshire complained about defective workmanship, Kelly had no reason not to believe that PCI would resolve the dispute.

6. The March contract did not disqualify PCI from handling any disputes. Page one of the contract indicates that PCI is substituted for the architect for all purposes including dispute resolution.

7. Based on the fact that PCI would serve as project manager, the nature of the work PCI would perform, and the language of paragraph 10.5, Kelly agreed to the contract containing the arbitration provision. Kelly also agreed that PCI would substitute for the architect. Kelly was comfortable with the arbitration provision because he had worked with PCI on other projects.

8. Hearthshire never submitted its complaints to PCI as required by the contract. PCI confirmed that Hearthshire never submitted any disputes for resolution.

 While the affidavit is more substantial as to fraud in the inducement of the arbitration provision, it still falls short of what is required. In the affidavit, Mr. Kelly states that Hearthshire represented that PCI would be the architect and this representation, coupled with the wording of paragraph 10.5 induced him to enter into the arbitration provision. He further stated that the representation was false when it came to dispute resolution. But, nowhere in the affidavit does Mr. Kelly maintain that appellants knew the statement was false when it was made, that they intended that Kelly act based upon the statement, or that when the agreement was made, appellants had no present intent to perform. Kelly argues that these three

elements of fraud can be inferred. In support of this proposition, Kelly cites *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc.*, 703 S.W.2d 209 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); however, *New Process Steel* is distinguishable from the case before us.

In *New Process Steel*, S & S Alloys (S & S) owed Steel Corporation of Texas (SCOT) an unsecured debt of $500,000. Because of the financial condition of S & S, it was questionable whether the debt would ever be paid. *Id.* at 211. When the secured creditors of S & S threatened foreclosure, SCOT bought out their interests, and decided to obtain better management for S & S so that it could become profitable again. *Id.* SCOT's board of directors authorized its president, Kiefer, to negotiate with New Process Steel about taking over management of S & S. *Id.* As a result of the negotiations, a management agreement was reached. New Process Steel agreed to provide management, inventory, and working capital to S & S while deciding if it was interested in purchasing the business. *Id.* SCOT agreed that: (1) it would not try to collect its debt from S & S during the term of the management agreement; and (2) that as the sole secured creditor of S & S, it would place an upper limit on its security interest in an amount equal to the dollar value of that security interest at the time New Process Steel began its management. *Id.* During the management period, New Process Steel made sales and cash advances to S & S, while the parties continued to negotiate regarding the purchase of S & S. *Id.* New Process Steel considered SCOT's release of its security interest in S & S essential to any agreement. *Id.* Kiefer kept SCOT's executive board informed throughout the negotiations. *Id.*

The parties reached an agreement, and a closing date was set for January 16, 1979. *Id.* Before the closing date, Kiefer spoke with a majority of the executive board members and received their approval. *Id.* At closing, New Process Steel purchased S & S with the understanding that SCOT would accept a new note in exchange for the $1,000,000 note that SCOT held against S & S, and the outstanding accounts receiv-

able due to SCOT from S & S. *Id.* at 212. This "understanding" was not reduced to writing at the time of the closing.

After the closing, SCOT's management had second thoughts about the agreement. *Id.* SCOT fired Kiefer in June of 1979, and then advised New Process Steel that it would not perform the January 16 agreement. *Id.* Thereby, in effect, denying the existence of the agreement. New Process Steel brought suit against SCOT for breach of contract and fraud. *Id.* The jury found for New Process Steel on its fraud claim [4], but the trial court refused to give effect to the damage issue based on the fraud claim. *Id.* at 213. New Process Steel complained about this refusal on appeal.

The court of appeals held that a trial court may disregard a jury's finding to a special issue, only if the finding has no support in the evidence or it is rendered immaterial by other findings. *Id.* The court then set out to determine whether the evidence was sufficient to support a finding of fraud and the damages awarded by the jury for the fraud claim. As in the case before us, *New Process Steel* involved a promise to take action in the future.

After listing the elements of fraud, including present intent not to perform, the court of appeals stated that fraudulent intent is an element of fraud that is difficult to prove. *Id.; see Freeman v. Greenbriar Homes, Inc.,* 715 S.W.2d 394, 397 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). But, the court stated, when a party denies making the agreement and fails to perform, this constitutes evidence from which lack of present intent to perform may be inferred. *New Process Steel,* 703 S.W.2d at 214. In order for *New Process Steel* to aid Kelly, we must find that the element of "lack of present intent to perform" is in effect the same as the element "knowingly making a false statement." Thus, Kelly's argument must be that if one can infer the former, the latter element of fraud may also be inferred. Further, Kelly would also have this court assume that if these two elements can be inferred, it is reasonable to assume that the statement was made with

the intent that it should be acted upon. Kelly wants us to accept this hypothesis because these three elements are the ones not addressed in Mr. Kelly's affidavit. Kelly argues that they should be inferred based upon *New Process Steel.* Even if we were to accept this interpretation, which we do not, Kelly's argument still fails because *New Process Steel* differs in one crucial respect.

In *New Process Steel,* Kiefer testified that he kept the board apprised of the negotiations, had full authority to make the agreement, and that the agreement was approved by the board. *Id.* Despite this, the chairman of the SCOT board **denied** that either he or the board had ever approved the agreement, and the evidence was clear that SCOT failed to perform under the agreement. *Id.* at 215. The court held that the denial of the agreement and the failure to perform was sufficient to allow the jury to infer that SCOT had never intended to perform the agreement, and had therefore defrauded New Process Steel. *See Id.*

In this case, we are not confronted with a party denying the existence of an agreement. Appellants do not deny the existence of the contract or the arbitration provision. In fact, they wish to rely on the arbitration provision and force Kelly to abide by it. Appellants simply do not agree with Kelly's interpretation of the contract or the arbitration provision. This is altogether different from denying that the agreement exists. Even if we were to accept Kelly's argument, we cannot, under the facts of *New Process Steel,* infer the missing fraud elements because appellants have not denied the existence of the agreement.

Therefore, since Kelly failed to provide some evidence on each of the elements of fraud in the inducement of the arbitration provision, the trial court erred if its order was based on Kelly's claim of fraud in the inducement of the arbitration provision. In that there is no evidence to support fraud in the inducement of the arbitration provi-

---

4. The other jury findings in the case are irrelevant for our purposes here.

sion, appellants' fifth point of error is sustained.

 In points of error two, four, and six, appellants contend that the trial court erred in denying their motions to stay litigation and compel arbitration based on unconscionability. After reviewing the record, we find that the legal theory of unconscionability was never raised or argued by Kelly as grounds for avoiding the arbitration provision. When there are no findings of facts and conclusions of law, we must affirm the judgment if there is evidence to support it on any legal theory raised by the prevailing party. *Gulf Interstate,* 680 S.W.2d at 881. Since unconscionability was never asserted by Kelly, it could not have been relied on by the trial court in making its determination to deny appellants' motions. Thus, it is unnecessary for us to address points two, four, and six since they could not have been the basis for the trial court's order.

 In their seventh point of error, appellants contend that the trial court erred in finding that the Texas Property Code preludes the resolution of the underlying contract dispute by arbitration.

In its second amended petition, Kelly sought enforcement and foreclosure of a mechanic and materialman's lien. Kelly argued in the trial court that under Texas Property Code §§ 53.154 and 53.158, it was required to bring the action through a lawsuit and not through arbitration. We agree with Kelly that an M & M lien must be foreclosed by a court of competent jurisdiction; however, this does not mean that the underlying contract, which forms the basis of the lien, cannot be arbitrated.

The Texas Property Code provides:

A mechanic's lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien.

TEX.PROP.CODE ANN. § 53.154 (Vernon 1984).

The Code also provides:

Suit must be brought to foreclose the lien within two years after the date of filing the lien affidavit under Section 53.-052 or within one year after completion of the work under the original contract under which the lien is claimed, whichever is later.

TEX.PROP.CODE ANN. § 53.158 (Vernon Supp. 1992). Kelly contends that the language of these sections is mandatory, and therefore, arbitration is unavailable on this issue. The sections are mandatory; however, Kelly desires a broader interpretation than is permitted by the clear language of the sections.

Sections 53.154 and 53.158 require that a suit for **foreclosure** must be brought, and that the lien can only be **foreclosed** by a court of competent jurisdiction. Appellants contend that these sections do not state that arbitration is unavailable to determine which party prevails in the underlying dispute. They argue that these sections only require that the actual foreclosure of the lien be performed by a court of competent jurisdiction. In support of their argument, appellants cite *Mountain Plains Constructors, Inc. v. Torrez,* 785 P.2d 928 (Colo. 1990).

We decline to follow the approach advocated by Kelly, and choose to adopt the one presented by appellants and accepted by the Colorado Supreme Court. In *Mountain Plains,* the Colorado court addressed the issue of the proper disposition of an M & M lien when arbitration is required. The court held that when a party is entitled to arbitration, the foreclosure of an M & M lien shall be stayed until the arbitrators determine whether the party seeking foreclosure prevails in the underlying dispute. *Id.* at 931.

Kelly argues that we should not accept this approach because this case is interpreting Colorado statutory law, not Texas law. Though we have found no Colorado statutes that correspond precisely to the language contained TEX.PROP.CODE ANN. §§ 53.154 and 53.158, it is clear from the statutes regarding the enforcement of liens that Colorado also requires that foreclosure be accomplished by filing suit in a court of competent jurisdiction. *See* COLO. REV.STAT.ANN. §§ 38–20–106, 38–22–105.5,

38–22–110 through 38–22–116, and 38–22–120 (West 1990 & 1992). Therefore, there is no reason to decline to adopt this approach.

But beyond this, our decision on this issue is the result of common sense. If we allowed Kelly to foreclose the M & M lien before arbitration, and the arbitrators found for appellants, they would be without recourse. The lien would be foreclosed, the property disposed of, and no money judgment could adequately replace the lost property. However, if Kelly prevails in the arbitration, it may then have the arbitration award confirmed by the court under the Texas General Arbitration Act, and can sue to foreclose the M & M lien. TEX.REV. CIV.STAT.ANN. art. 236 (Vernon 1973). Kelly will have an adequate remedy at law. Appellants' seventh point of error is sustained.

■ In their eighth point of error, appellants allege that the trial court erred in finding that Kelly's claims as to the Landing renovation project are not arbitrable.

As part of its fraudulent inducement claim, Kelly asserted that it had only entered into the contracts involving the Gardens because it had been promised the $4.5 million renovation project on the Landing. Besides using this as part of its claim for fraudulent inducement, Kelly, in its second amended petition, filed claims against appellants for negligent and grossly negligent misrepresentation, DTPA, promissory estoppel, and breach of an oral contract based on the Landing project. Appellants contend that all of these claims should be included in the arbitration proceedings because they "arise out of, or relate to the contract or breach thereof," as provided in the arbitration provisions contained in the January and March contracts covering the Gardens.

■ We agree with appellants that causes of action sounding in tort are not automatically exempted from arbitration. A dispute arising out of a contractual relationship may give rise to breach of contract claims and tort claims. *See Valero Energy Corp. v. Wagner & Brown*, 777 S.W.2d 564, 566–67 (Tex.App.—El Paso 1989, writ denied). To determine whether the particular tort claim is subject to arbitration, the court must determine whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract. *Id.* at 566. Thus, here, the question is whether Kelly's claims as to the Landing project can stand alone or can be maintained without reference to the contracts involving the Gardens. We hold that they can.

■ The only connection between the Landing project and the contracts involving the Gardens is Kelly's claim that the promise of the Landing project fraudulently induced it to enter the contracts for the renovation of the Gardens. If necessary, Kelly need not even refer to the contracts involving the Gardens in order to maintain the claims regarding the Landing. Kelly could assert that it was fraudulently promised the Landing project and that the promise was breached, even if the Garden contracts had never existed. Further, when a dispute arises between contracting parties whose relationship includes an agreement to arbitrate any dispute arising out of or under the contract, the trial court must determine whether the issues presented are subject to arbitration under that agreement. *Id.* at 567. The parties must have specifically agreed by clear language to arbitrate the matters in dispute. *Id.* The contracts covering the Gardens make no reference to the Landing project and it would take a leap of logic to argue that the arbitration provisions in the contracts were meant to encompass any disputes arising out of a project not mentioned in the contract and one that had not even been fully discussed. We hold that the claims arising out of the Landing renovation project are separate and distinct from those arising out of the contracts pertaining to the Gardens. Therefore, the Landing claims do not have to be arbitrated, and Kelly may proceed with the litigation as to those claims. Appellants' eighth point of error is overruled.

In point of error nine, appellants assert that the trial court erred in finding that the dispute between the parties over paragraph 10.5 of the contract is not a proper subject for arbitration.

■ Though both sides have made numerous allegations against the other, the real dispute in this case concerns the interpretation of paragraph 10.5 of the contract, i.e., whether PCI was, or was to act as, the architect on the Gardens project. Arbitration is designed for that purpose. If we were to say that it is improper to allow arbitrators to determine the meaning of contractual provisions, we would render the entire arbitrary scheme meaningless. Since we have already determined that Kelly has failed to prove fraud, or any other ground to excuse itself from the arbitration provision, all of the disputes involving the contracts pertaining to the Gardens should be arbitrated, including the interpretation of paragraph 10.5. The issue as to whether there is a valid arbitration provision is separate from the issue of whether the contract was breached, the former is determined the court, and the latter by an arbitrator. *Shearson Lehman Hutton, Inc. v. McKay*, 763 S.W.2d 934, 938 (Tex.App.—San Antonio 1989, no writ). Appellants' ninth point of error is sustained.

■ Appellants next contend that the trial court erred in finding that the arbitration provision of the January contract was not enforceable against Kelly because Hearthshire did not sign the contract.

Article 224 of the Texas General Arbitration Act provides that arbitration agreements, whether separate or within the confines of a contract, must be in writing. TEX.REV.CIV.STAT.ANN. art. 224 (Vernon Supp.1992). Article 224, however, does not require that the agreement or the contract be signed by the parties in order for the arbitration provision to be valid except in two specific instances: contracts for the acquisition of property, services, money, or credit where the consideration is $50,000 or less, and claims for personal injury. Those instances do not apply here.

■ Since article 224 provides that an arbitration provision may be revoked "upon such grounds as exist at law or in equity for the revocation of any contract," we must determine whether Hearthshire's failure to sign the January contract is a ground to revoke the contract, and therefore, the arbitration provision. Under the general rules of contract law, a party is bound by the terms of the contract that he has signed, except upon a showing of special circumstances. *Shearson Lehman Hutton*, 763 S.W.2d at 937. Kelly has produced no evidence of any special circumstances. Further, for a contract to be valid, it is not necessary that the agreement be signed by both parties. *E.g., Velasquez v. Schuehle*, 562 S.W.2d 1, 3 (Tex.Civ. App.—San Antonio 1977, no writ). If one party signs, the other may accept by his acts, conduct or acquiescence in the terms of the contract. *Id.* Kelly signed the January contract, and though Hearthshire did not sign the contract, its acts, including the execution of the March contract and the position taken in this appeal, clearly show intent to be bound by the January contract. Appellants' tenth point of error is sustained.

Point of error number eleven states that even if only some of the claims are arbitrable and others are not, the trial court erred in not staying the litigation as to any of the claims that are arbitrable and compelling arbitration of those claims. Our holding in point of error eight makes it unnecessary to review this point of error. We have already determined which claims are not arbitrable and which are. The parties are to arbitrate all claims involving the contracts pertaining to the Gardens. Any claims that relate to the Landing renovation project may proceed to litigation. Our reasons for this decision were spelled out in the discussion under point of error number eight.

In their final point of error, appellants contend that the trial court erred in not consolidating the arbitration proceedings because Kelly presented no evidence, or insufficient evidence that it would be prejudiced by the resolution of all disputes in one consolidated proceeding.

When Hearthshire filed its demands for arbitration with the AAA, it filed a separate demand for each contract. It then immediately sought to consolidate them according to AAA procedures. Appellants want this court to order the trial court to consolidate the arbitrable claims into one proceeding.

Because the trial court denied, in error, appellants' motions to stay litigation and compel arbitration, it never reached the issue of whether the arbitration proceedings should be consolidated. We cannot reverse a trial court on a decision it never reached. Appellants' twelfth point of error is overruled.

The order of the trial court is reversed except as to Kelly's claims involving the Landing renovation project. The trial court is directed to make orders such as are necessary to comply with this court's opinion.