173 F.3d 933
 79 Fair Empl.Prac.Cas. (BNA) 629,
75 Empl. Prac. Dec. P 45,822
HOOTERS OF AMERICA, INCORPORATED, a Georgia corporation,
Plaintiff-Appellant,
v.
Annette R. PHILLIPS, an individual resident of South
Carolina, Defendant & Third Party Plaintiff-Appellee,
v.
Hooters of Myrtle Beach, Incorporated, a Georgia
corporation, Third Party Defendant-Appellant.
National Restaurant Association; Society of Professionals
in Dispute Resolution; National Academy of
Arbitrators; Equal Employment
Opportunity Commission, Amici Curiae.
 No. 98-1459.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 28, 1999.
Decided April 8, 1999.
 
 ARGUED: Mark David Halverson, Elarbee, Thompson & Trapnell, L.L.P., Atlanta, Georgia, for Appellants. Sandra C. McCallion, Debevoise & Plimpton, New York, New York, for Appellee. Robert John Gregory, Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae EEOC. ON BRIEF: Stanford G. Wilson, Elarbee, Thompson & Trapnell, L.L.P., Atlanta, Georgia, for Appellants. John S. Kiernan, Justin S. Weddle, Debevoise & Plimpton, New York, New York; Armand G. Derfner, Charleston, South Carolina; Terry Ann Rickson, Charleston, South Carolina; Thomas J. Henderson, Richard Seymour, Teresa A. Ferrante, Lawyers Committee for Civil Rights Under Law, Washington, D.C., for Appellee. C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae EEOC. Peter G. Kilgore, National Restaurant Association, Washington, D.C., for Amicus Curiae Association. Daniel Bowling, Society of Professionals in Dispute Resolution, Washington, D.C., for Amicus Curiae Society. Donald T. Weckstein, University Of San Diego, San Diego, California, for Amicus Curiae Academy.
 Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge, and GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.
 Affirmed and remanded by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge TRAXLER and Judge GOODWIN joined.
 OPINION
 WILKINSON, Chief Judge:
 
 
 1
 Annette R. Phillips alleges that she was sexually harassed while working at a Hooters restaurant. After quitting her job, Phillips threatened to sue Hooters in court. Alleging that Phillips agreed to arbitrate employment-related disputes, Hooters preemptively filed suit to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4. Because Hooters set up a dispute resolution process utterly lacking in the rudiments of even-handedness, we hold that Hooters breached its agreement to arbitrate. Thus, we affirm the district court's refusal to compel arbitration.
 
 I.
 
 2
 Appellee Annette R. Phillips worked as a bartender at a Hooters restaurant in Myrtle Beach, South Carolina. She was employed since 1989 by appellant Hooters of Myrtle Beach (HOMB), a franchisee of appellant Hooters of America (collectively Hooters).
 
 
 3
 Phillips alleges that in June 1996, Gerald Brooks, a Hooters official and the brother of HOMB's principal owner, sexually harassed her by grabbing and slapping her buttocks. After appealing to her manager for help and being told to "let it go," she quit her job. Phillips then contacted Hooters through an attorney claiming that the attack and the restaurant's failure to address it violated her Title VII rights. Hooters responded that she was required to submit her claims to arbitration according to a binding agreement to arbitrate between the parties.
 
 
 4
 This agreement arose in 1994 during the implementation of Hooters' alternative dispute resolution program. As part of that program, the company conditioned eligibility for raises, transfers, and promotions upon an employee signing an "Agreement to arbitrate employment-related disputes." The agreement provides that Hooters and the employee each agree to arbitrate all disputes arising out of employment, including "any claim of discrimination, sexual harassment, retaliation, or wrongful discharge, whether arising under federal or state law." The agreement further states that
 
 
 5
 the employee and the company agree to resolve any claims pursuant to the company's rules and procedures for alternative resolution of employment-related disputes, as promulgated by the company from time to time ("the rules"). Company will make available or provide a copy of the rules upon written request of the employee.
 
 
 6
 The employees of HOMB were initially given a copy of this agreement at an all-staff meeting held on November 20, 1994. HOMB's general manager, Gene Fulcher, told the employees to review the agreement for five days and that they would then be asked to accept or reject the agreement. No employee, however, was given a copy of Hooters' arbitration rules and procedures. Phillips signed the agreement on November 25, 1994. When her personnel file was updated in April 1995, Phillips again signed the agreement.
 
 
 7
 After Phillips quit her job in June 1996, Hooters sent to her attorney a copy of the Hooters rules then in effect. Phillips refused to arbitrate the dispute.
 
 
 8
 Hooters filed suit in November 1996 to compel arbitration under 9 U.S.C. § 4. Phillips defended on the grounds that the agreement to arbitrate was unenforceable. Phillips also asserted individual and class counterclaims against Hooters for violations of Title VII and for a declaration that the arbitration agreements were unenforceable against the class. In response, Hooters requested that the district court stay the proceedings on the counterclaims until after arbitration, 9 U.S.C. § 3.
 
 
 9
 In March 1998, the district court denied Hooters' motions to compel arbitration and stay proceedings on the counterclaims. The court found that there was no meeting of the minds on all of the material terms of the agreement and even if there were, Hooters' promise to arbitrate was illusory. In addition, the court found that the arbitration agreement was unconscionable and void for reasons of public policy. Hooters filed this interlocutory appeal, 9 U.S.C. § 16.
 
 II.
 
 10
 The benefits of arbitration are widely recognized. Parties agree to arbitrate to secure "streamlined proceedings and expeditious results [that] will best serve their needs." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 633, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The arbitration of disputes enables parties to avoid the costs associated with pursuing a judicial resolution of their grievances. By one estimate, litigating a typical employment dispute costs at least $50,000 and takes two and one-half years to resolve. Amicus Brief for Society of Professionals in Dispute Resolution at 2-3 (citing Baxter, Arbitration or Litigation for Employment Civil Rights?, 2 Individual Employment Rights 19 (1993 94); Maltby, The Projected Impact of the Model Employment Termination Act, Annals of the Am. Acad. of Pol. and Soc. Sci. (Nov. 1994)). Further, the adversarial nature of litigation diminishes the possibility that the parties will be able to salvage their relationship. For these reasons parties agree to arbitrate and trade "the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (internal quotation marks omitted).
 
 
 11
 In support of arbitration, Congress passed the Federal Arbitration Act (FAA), ch. 213, 43 Stat. 883 (1925) (codified as amended at 9 U.S.C. § 1 et seq.). "Its purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." Gilmer, 500 U.S. at 24, 111 S.Ct. 1647. The FAA manifests "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). When a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA commands the federal courts to stay any ongoing judicial proceedings, 9 U.S.C. § 3, and to compel arbitration, id. § 4.
 
 
 12
 The threshold question is whether claims such as Phillips' are even arbitrable. The EEOC as amicus curiae contends that employees cannot agree to arbitrate Title VII claims in predispute agreements. We disagree. The Supreme Court has made it plain that judicial protection of arbitral agreements extends to agreements to arbitrate statutory discrimination claims. In Gilmer v. Interstate/Johnson Lane Corp., the Court noted that " '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " 500 U.S. at 26, 111 S.Ct. 1647 (alteration in original) (quoting Mitsubishi Motors, 473 U.S. at 628, 105 S.Ct. 3346). Thus, a party must be held to the terms of its bargain unless Congress intends to preclude waiver of a judicial forum for the statutory claims at issue. Such an intent, however, must "be discoverable in the text of the [substantive statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." Id.
 
 
 13
 The EEOC argues that in passing the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, Congress evinced an intent to prohibit predispute agreements to arbitrate claims arising under Title VII. This circuit, however, has already rejected this argument. Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 881-82 (4th Cir.1996). The Civil Rights Act of 1991 provided that "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under [Title VII]." Pub. L. No. 102-166, § 118, 105 Stat. at 1081. In Austin, we stated that this language "could not be any more clear in showing Congressional favor towards arbitration." 78 F.3d at 881. We also noted that the legislative history did not establish a contrary intent nor was there an "inherent conflict" between the Civil Rights Act and arbitration. Id. at 881-82. This holding is in step with our sister circuits which have also rejected the EEOC's argument. See, e.g., Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith Inc., 170 F.3d 1, 4-9 (1st Cir.1999); Seus v. John Nuveen & Co., 146 F.3d 175, 182-83 (3d Cir.1998), cert. denied, --- U.S. ----, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir.1997). But see Duffield v. Robertson Stephens & Co., 144 F.3d 1182, 1189-1200 (9th Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 465, 142 L.Ed.2d 418 (1998).
 
 III.
 
 14
 Predispute agreements to arbitrate Title VII claims are thus valid and enforceable. The question remains whether a binding arbitration agreement between Phillips and Hooters exists and compels Phillips to submit her Title VII claims to arbitration. The FAA provides that agreements "to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "It [i]s for the court, not the arbitrator, to decide in the first instance whether the dispute [i]s to be resolved through arbitration." AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 651, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); see also A.T. Massey Coal Co. v. International Union, 799 F.2d 142, 146 (4th Cir.1986) ("[W]hether there is a contract to arbitrate 'is undeniably an issue for judicial determination.' " (quoting AT & T Techs., 475 U.S. at 649, 106 S.Ct. 1415)). In so deciding, we " 'engage in a limited review to ensure that the dispute is arbitrable--i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.' " Glass v. Kidder Peabody & Co., 114 F.3d 446, 453 (4th Cir.1997) (quoting PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir.1990)).
 
 
 15
 Hooters argues that Phillips gave her assent to a bilateral agreement to arbitrate. That contract provided for the resolution by arbitration of all employment-related disputes, including claims arising under Title VII. Hooters claims the agreement to arbitrate is valid because Phillips twice signed it voluntarily. Thus, it argues the courts are bound to enforce it and compel arbitration.
 
 
 16
 We disagree. The judicial inquiry, while highly circumscribed, is not focused solely on an examination for contractual formation defects such as lack of mutual assent and want of consideration. Virginia Carolina Tools, Inc. v. International Tool Supply, Inc., 984 F.2d 113, 118-19 (4th Cir.1993) (holding that continued existence of arbitration agreement is matter for judicial determination). Courts also can investigate the existence of "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, the grounds for revocation must relate specifically to the arbitration clause and not just to the contract as a whole. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402-04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); see also Wick v. Atlantic Marine, Inc., 605 F.2d 166, 168 (5th Cir.1979). In this case, the challenge goes to the validity of the arbitration agreement itself. Hooters materially breached the arbitration agreement by promulgating rules so egregiously unfair as to constitute a complete default of its contractual obligation to draft arbitration rules and to do so in good faith.
 
 
 17
 Hooters and Phillips agreed to settle any disputes between them not in a judicial forum, but in another neutral forum--arbitration. Their agreement provided that Hooters was responsible for setting up such a forum by promulgating arbitration rules and procedures. To this end, Hooters instituted a set of rules in July 1996.[1]
 
 
 18
 The Hooters rules when taken as a whole, however, are so one-sided that their only possible purpose is to undermine the neutrality of the proceeding. The rules require the employee to provide the company notice of her claim at the outset, including "the nature of the Claim" and "the specific act(s) or omissions(s) which are the basis of the Claim." Rule 6-2(1), (2). Hooters, on the other hand, is not required to file any responsive pleadings or to notice its defenses. Additionally, at the time of filing this notice, the employee must provide the company with a list of all fact witnesses with a brief summary of the facts known to each. Rule 6-2(5). The company, however, is not required to reciprocate.
 
 
 19
 The Hooters rules also provide a mechanism for selecting a panel of three arbitrators that is crafted to ensure a biased decisionmaker. Rule 8. The employee and Hooters each select an arbitrator, and the two arbitrators in turn select a third. Good enough, except that the employee's arbitrator and the third arbitrator must be selected from a list of arbitrators created exclusively by Hooters. This gives Hooters control over the entire panel and places no limits whatsoever on whom Hooters can put on the list. Under the rules, Hooters is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with Hooters and its management. In fact, the rules do not even prohibit Hooters from placing its managers themselves on the list. Further, nothing in the rules restricts Hooters from punishing arbitrators who rule against the company by removing them from the list. Given the unrestricted control that one party (Hooters) has over the panel, the selection of an impartial decision maker would be a surprising result.
 
 
 20
 Nor is fairness to be found once the proceedings are begun. Although Hooters may expand the scope of arbitration to any matter, "whether related or not to the Employee's Claim," the employee cannot raise "any matter not included in the Notice of Claim." Rules 4-2, 8-9. Similarly, Hooters is permitted to move for summary dismissal of employee claims before a hearing is held whereas the employee is not permitted to seek summary judgment. Rule 14-4. Hooters, but not the employee, may record the arbitration hearing "by audio or videotaping or by verbatim transcription." Rule 18-1. The rules also grant Hooters the right to bring suit in court to vacate or modify an arbitral award when it can show, by a preponderance of the evidence, that the panel exceeded its authority. Rule 21-4. No such right is granted to the employee.
 
 
 21
 In addition, the rules provide that upon 30 days notice Hooters, but not the employee, may cancel the agreement to arbitrate. Rule 23-1. Moreover, Hooters reserves the right to modify the rules, "in whole or in part," whenever it wishes and "without notice" to the employee. Rule 24-1. Nothing in the rules even prohibits Hooters from changing the rules in the middle of an arbitration proceeding.
 
 
 22
 If by odd chance the unfairness of these rules were not apparent on their face, leading arbitration experts have decried their one-sidedness. George Friedman, senior vice president of the American Arbitration Association (AAA), testified that the system established by the Hooters rules so deviated from minimum due process standards that the Association would refuse to arbitrate under those rules. George Nicolau, former president of both the National Academy of Arbitrators and the International Society of Professionals in Dispute Resolution, attested that the Hooters rules "are inconsistent with the concept of fair and impartial arbitration." He also testified that he was "certain that reputable designating agencies, such as the AAA and Jams/Endispute, would refuse to administer a program so unfair and one-sided as this one." Additionally, Dennis Nolan, professor of labor law at the University of South Carolina, declared that the Hooters rules "do not satisfy the minimum requirements of a fair arbitration system." He found that the "most serious flaw" was that the "mechanism [for selecting arbitrators] violates the most fundamental aspect of justice, namely an impartial decision maker." Finally, Lewis Maltby, member of the Board of Directors of the AAA, testified that "This is without a doubt the most unfair arbitration program I have ever encountered."
 
 
 23
 In a similar vein, two major arbitration associations have filed amicus briefs with this court. The National Academy of Arbitrators stated that the Hooters rules "violate fundamental concepts of fairness ... and the integrity of the arbitration process." Likewise, the Society of Professionals in Dispute Resolution noted that "[i]t would be hard to imagine a more unfair method of selecting a panel of arbitrators." It characterized the Hooters arbitration system as "deficient to the point of illegitimacy" and "so one sided, it is hard to believe that it was even intended to be fair."We hold that the promulgation of so many biased rules--especially the scheme whereby one party to the proceeding so controls the arbitral panel--breaches the contract entered into by the parties. The parties agreed to submit their claims to arbitration--a system whereby disputes are fairly resolved by an impartial third party. Hooters by contract took on the obligation of establishing such a system. By creating a sham system unworthy even of the name of arbitration, Hooters completely failed in performing its contractual duty.
 
 
 24
 Moreover, Hooters had a duty to perform its obligations in good faith. See Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 542 (4th Cir.1998) (" 'The courts could leave all discretion in performance unbridled.... No U.S. court now takes this approach.... Thus, contractual discretion is presumptively bridled by the law of contracts--by the covenant of good faith implied in every contract.' ") (quoting Steven J. Burton & Eric G. Anderson, Contractual Good Faith 46-47 (1995)). Good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a. Bad faith includes the "evasion of the spirit of the bargain" and an "abuse of a power to specify terms." Id. § 205 cmt. d. By agreeing to settle disputes in arbitration, Phillips agreed to the prompt and economical resolution of her claims. She could legitimately expect that arbitration would not entail procedures so wholly one-sided as to present a stacked deck. Thus we conclude that the Hooters rules also violate the contractual obligation of good faith.
 
 
 25
 Given Hooters' breaches of the arbitration agreement and Phillips' desire not to be bound by it, we hold that rescission is the proper remedy. Generally, "rescission will not be granted for a minor or casual breach of a contract, but only for those breaches which defeat the object of the contracting parties." Rogers v. Salisbury Brick Corp., 299 S.C. 141, 382 S.E.2d 915, 917 (1989); see also Hogue v. Pellerin Laundry Mach. Sales Co., 353 F.2d 772, 774 (8th Cir.1965) (noting rescission is permitted " 'for any breach of contract of so material and substantial a nature as would constitute a defense to an action brought by the party in default for a refusal to proceed with the contract.' " (quoting Williston on Contracts § 1467 (rev. ed.))). As we have explained, Hooters' breach is by no means insubstantial; its performance under the contract was so egregious that the result was hardly recognizable as arbitration at all. We therefore permit Phillips to cancel the agreement and thus Hooters' suit to compel arbitration must fail.[2]
 
 IV.
 
 26
 We respect fully the Supreme Court's pronouncement that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Moses H. Cone, 460 U.S. at 24, 103 S.Ct. 927. Our decision should not be misread: We are not holding that the agreement before us is unenforceable because the arbitral proceedings are too abbreviated. An arbitral forum need not replicate the judicial forum. "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." Mitsubishi Motors, 473 U.S. at 626-27, 105 S.Ct. 3346; see also Gilmer, 500 U.S. at 31-32, 111 S.Ct. 1647 (rejecting abbreviated discovery and lack of written opinions as reasons to inhibit arbitration of statutory claims).
 
 
 27
 Nor should our decision be misunderstood as permitting a full-scale assault on the fairness of proceedings before the matter is submitted to arbitration. Generally, objections to the nature of arbitral proceedings are for the arbitrator to decide in the first instance. Only after arbitration may a party then raise such challenges if they meet the narrow grounds set out in 9 U.S.C. § 10 for vacating an arbitral award. In the case before us, we only reach the content of the arbitration rules because their promulgation was the duty of one party under the contract. The material breach of this duty warranting rescission is an issue of substantive arbitrability and thus is reviewable before arbitration. See Glass, 114 F.3d at 453-56. This case, however, is the exception that proves the rule: fairness objections should generally be made to the arbitrator, subject only to limited post-arbitration judicial review as set forth in section 10 of the FAA.
 
 
 28
 By promulgating this system of warped rules, Hooters so skewed the process in its favor that Phillips has been denied arbitration in any meaningful sense of the word. To uphold the promulgation of this aberrational scheme under the heading of arbitration would undermine, not advance, the federal policy favoring alternative dispute resolution. This we refuse to do.
 
 
 29
 The judgment of the district court is affirmed, and the case is remanded for further proceedings consistent with this opinion.
 
 
 30
 AFFIRMED AND REMANDED.
 
 
 
 [1]
 The 1996 rules superseded a set of rules drafted in 1994 and would govern any arbitration of Phillips' claims. Because we deal with Hooters' performance under the agreement and not contract formation issues, we focus exclusively on the details of the 1996 rules
 
 
 [2]
 Phillips asserts that the Hooters rules also attempt to effect a waiver of substantive statutory rights by limiting the remedies that an arbitration panel may award. She further argues that employees cannot waive substantive statutory rights in predispute arbitration agreements, or at the very least, such waivers must be knowing and voluntary. Because we hold that no valid agreement to arbitrate exists in this case, we need not take up these questions