Criminal Case Template




COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



TRI-STAR PETROLEUM COMPANY,


 Appellant,


v.


TIPPERARY CORPORATION,
TIPPERARY OIL & GAS
CORPORATION, TIPPERARY OIL &
GAS (AUSTRALIA) PTY LTD.,
CRAIG, LTD., AND W.D. KENNEDY,


 Appellees.

§


§


§


§


§

No. 08-02-00305-CV


Appeal from the


238th District Court


of Midland County, Texas


(TC# CV42,265)


O P I N I O N



 This is an interlocutory appeal from an order denying a motion to compel
arbitration. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND


 This case arises from an operating agreement that governs a natural gas project in
Australia known as the Comet Ridge Project. Tipperary Corporation, Tipperary Oil &
Gas Corporation, and Tipperary Oil & Gas (Australia) Pty Ltd. (collectively "Tipperary")
are non-operating interest owners under the operating agreement. At the time of the
events giving rise to this suit, Tri-Star Petroleum Company was the operator. (1)

 Exhibit C to the operating agreement provides that the operator may charge certain
expenses relating to the Comet Ridge Project to a joint account and that the non-operating
interest owners will pay proportionate shares of these charges. After a few years of
operations, a dispute arose between Tri-Star and Tipperary about Tri-Star's charges to the
joint account. This dispute evolved into a lawsuit filed by Tri-Star against Tipperary. 
The parties settled this suit by entering into a mediation agreement on May 2, 1996.

 The mediation agreement contained the following provisions for the resolution of
the joint account dispute:

 7. As to the existing joint interest billing audits, it is agreed that Tri-Star shall hire for the joint account a "Big Six" accounting firm
familiar with international petroleum operations to do the following:


 A. Review the nature of the Comet Ridge Project;

 B. Study and consider the various international accounting
procedure forms available, their own clients' practices and
consider any other benchmark studies they may have
conducted or have access to;

 C. Select an international accounting procedure containing
expense categories that, when used as a supplement to
"DIRECT CHARGES" of Exhibit "C" II to the Operating
Agreement, is best suited to the Comet Ridge Project
operations; and

 D. Determine which expenses shall be considered properly
chargeable expenditures under the Operating Agreement
considering the provisions of the Operating Agreement,7.C
above and that "on the Joint Property" as used in the
Operating Agreement, in the context of this project, can refer
to and mean subject matter as well as geographic locality.


 Such determination shall be final and binding on the parties
hereto and may be enforced as [a] final judgment under the
Arbitration Statute of the State of Texas. 


 8. Hereafter, any audit disputes that are not resolved as a result of the
customary audit process will be resolved by the Big Six accounting
firm named pursuant to paragraph 7 in the same manner provided in
paragraph 7D above. (2)


Tri-Star hired the Brisbane, Australia office of Ernst & Young to perform the tasks
contemplated by the arbitration agreement.

 More than two years passed, and Ernst & Young did not issue a report. 
Meanwhile, new disputes over charges to the joint account arose. (3) In August 1998,
Tipperary filed suit against Tri-Star, claiming Tri-Star breached the operating agreement
and failed to complete its obligations under the arbitration agreement. (4)

 In October 1998, Ernst & Young finally issued its report. Tri-Star filed a motion
to confirm the report as an arbitration award. Tri-Star also filed a motion to compel
arbitration of the post-1995 disputes. The trial court determined that fact issues existed as
to whether Ernst & Young conducted a valid and enforceable arbitration process and that
these fact issues affected Tri-Star's rights to compel arbitration and to confirmation of
Ernst & Young's report. The court therefore denied the motion to compel without
prejudice to Tri-Star's right to re-urge the motion after the conclusion of an evidentiary
hearing. The court also held that the requirements of the Texas Arbitration Act (TAA)
apply to all arbitrations conducted under the arbitration agreement.

 Tri-Star appealed the denial of its motion to compel to this Court. See Tri-Star
Petroleum Co. v. Tipperary Corp., No. 08-00-00217-CV, 2001 WL 175533, at *1 (Tex.
App.--El Paso Feb. 22, 2001, no pet.) (not designated for publication) [hereinafter Tri-Star I]. To resolve the issues raised on appeal, we found it necessary to determine what
issues may be raised and considered in a motion to compel arbitration. See id. at *3. We
stated:

 [I]n its response to Tri-Star's motion to compel arbitration, Tipperary
asserted that Tri-Star's tampering with the arbitration process constituted a
material breach of the arbitration agreement which rendered the agreement
unenforceable. The trial court granted, albeit in a limited fashion,
Tipperary's objections to the motion to confirm and motion to compel, and
determined that fact issues exist with respect to the validity of the
arbitration process. The trial court concluded that the existence of these
fact issues affected not only the decision to confirm the award, but also
whether arbitration of the [post-1995 disputes] should be compelled. We
agree with the trial court's conclusion. If Tipperary's allegations regarding
corruption, fraud, tampering, and other undue means on the part of Tri-Star
and the arbitrator are later established, and it establishes that these facts
render the arbitration agreement unenforceable, the trial court could not
only vacate the award, but under certain circumstances could also refuse to
compel arbitration.


Id. at *5 (emphasis added). We affirmed the trial court's order. See id. at *6.

 Back in the trial court, Tri-Star stipulated that the Ernst & Young report should be
vacated because no hearing was conducted as required by the TAA. But Tri-Star also
requested the trial court to compel re-arbitration of the 1994-95 disputes. Tipperary
objected to re-arbitration.

 After a three-day evidentiary hearing, the court issued an order finding that Tri-Star hired Ernst & Young not as a neutral arbitrator, but in the capacity of its own
accounting firm; Tri-Star engaged in a conscious effort to exclude Tipperary from access
to Ernst & Young; Ernst & Young did not comply with the TAA and acted in strict
loyalty to Tri-Star; the arbitration process was extremely long, costly, and inefficient;
valuable productive time in the drilling program was lost because of the flawed
arbitration process; Tri-Star exercised undue influence over Ernst & Young; the "efficacy
of the entire [arbitration] process . . . was irretrievably compromised by Tri-Star's
conduct;" and Tipperary was deprived of the benefits it reasonably expected would flow
from the arbitration process. Based on these findings, the court determined that the Ernst
& Young report was obtained by "undue means" and that the arbitration agreement "is
rendered no longer enforceable due to the material breach by Tri-Star and the
participation in that conduct by Ernst & Young." Accordingly, the court vacated the
Ernst & Young report as an arbitration award and refused to compel re-arbitration of the
1994-95 disputes or arbitration of the post-1995 disputes. Tri-Star now appeals from this
order.

MATERIAL BREACH AS A GROUND FOR

REVOKING AN ARBITRATION AGREEMENT


 In its first issue, Tri-Star argues that misconduct, no matter how egregious, during
arbitration proceedings can never provide a basis for revoking an arbitration agreement. 
Tipperary argues, and the trial court found, that Tri-Star's misconduct amounted to a
material breach of the arbitration agreement. Therefore, the first question we must
answer is whether material breach is a valid ground for revoking an arbitration agreement. 
This is a question of law, which we determine de novo. See Fridl v. Cook, 908 S.W.2d
507, 511 (Tex. App.--El Paso 1995, writ dism'd w.o.j.). For the reasons explained below,
we answer the question in the affirmative.

 Because arbitration is a creature of contract, we apply standard contract principles
to determine the enforceability of arbitration agreements. See Prima Paint Corp. v. Flood
& Conklin Mfg., 388 U.S. 395, 404 n.12, 87 S.Ct. 1801, 1806 n.12, 18 L.Ed.2d 1270 
(1967); Ysleta Indep. Sch. Dist. v. Godinez, 998 S.W.2d 700, 702 (Tex. App.--El Paso
1999, no pet.). "A fundamental principle of contract law is that when one party to a
contract commits a material breach of that contract, the other party is discharged or
excused from any obligation to perform." Hernandez v. Gulf Group Lloyds, 875 S.W.2d
691, 692 (Tex. 1994). Thus, because material breach is a ground for revoking a contract,
it should be a ground for revoking an arbitration agreement.

 The language of the TAA supports this outcome. The TAA provides, "A party
may revoke the agreement [to arbitrate] only on a ground that exists at law or in equity for
the revocation of a contract." Tex. Civ. Prac. & Rem. Code Ann. § 171.001(b) (Vernon
Supp. 2003). As stated above, material breach is a ground for revoking a contract.

 Tri-Star asserts that the only grounds for revoking an arbitration agreement under
section 171.001(b) are contract formation defenses, such as lack of consideration,
mistake, and duress. Tri-Star claims that these are the only grounds that have been
addressed in cases construing section 171.001(b). See, e.g., J.M. Davidson, Inc. v.
Webster, 49 S.W.3d 507, 512, 514 (Tex. App.--Corpus Christi 2001, pet. granted) (lack of
consideration). But we are not aware of any authority limiting section 171.001(b) to
contract formation defenses, and we find nothing in the statute to suggest that it should be
so limited.

 The Federal Arbitration Act (FAA) contains a provision similar to section
171.001(b). The FAA provides that an arbitration agreement may be revoked on "such
grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2
(1999). Because of the similarities between the TAA and the FAA, federal arbitration
cases may constitute persuasive authority for interpreting the TAA.

 The Supreme Court has held that Congress enacted section 2 of the FAA "to make
arbitration agreements as enforceable as other contracts, but not more so." Prima Paint, 
388 U.S. at 404 n.12, 87 S.Ct. at 1806 n.12; see also Doctor's Assocs. v. Casarotto, 517
U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996). Contrary to this policy,
Tri-Star's interpretation of section 171.001(b) would make arbitration agreements more
enforceable than other contracts.

 The parties have cited two federal appellate cases that address whether material
breach may be a ground for revoking an arbitration agreement. Tri-Star relies on
Middlesex County v. Gevyn Construction Corp., 450 F.2d 53 (1st Cir. 1971). In that case,
the court rejected the argument that a material breach of an arbitration agreement renders
the agreement unenforceable. Construing section 2 of the FAA, the court held that "the
only grounds for revocation [of an arbitration agreement] . . . are mutual agreement or a
condition which vitiates [the] agreement ab initio, i.e., fraud, mistake, or duress." 
Middlesex County, 450 F.2d at 56.

 Tipperary relies on Hooters of America, Inc. v. Phillips, 173 F.3d 933 (4th Cir.
1999), which reached a conclusion directly at odds with Middlesex County. The court
held that section 2 of the FAA is not limited to "contractual formation defects such as
lack of mutual assent and want of consideration." Phillips, 173 F.3d at 938. The
arbitration agreement at issue in Phillips required an employer to promulgate rules under
which the arbitration would be conducted. The court held that the employer materially
breached the arbitration agreement by promulgating egregiously unfair rules. See id. 
Because of this material breach, the court held that the arbitration agreement was
unenforceable and affirmed the trial court's refusal to compel arbitration. See id. at 940-41.

 Tipperary argues that this case is analogous to Phillips: Like the employer in that
case, Tri-Star was responsible for handling how the arbitration was conducted and it
failed in this duty to such an extent that it materially breached the arbitration agreement. 
Tri-Star responds that Phillips involved particularly egregious facts and that the decision
should be limited to those facts. See id. at 941 (cautioning against reading the decision
broadly as a "full-scale assault" on arbitration). Tri-Star also points out that Phillips is
factually distinguishable from this case because, among other things, it did not involve
misconduct during the course of arbitration proceedings.

 We believe that the Phillips interpretation of section 2 of the FAA conforms more
closely to the language of that statute, and to the language of section 171.001(b) of the
TAA, than the Middlesex County interpretation does. Although Phillips is somewhat
factually distinguishable, we rely on it merely for the legal proposition that a material
breach of an arbitration agreement may provide a basis for revoking the agreement.

 Tri-Star argues that other provisions of the TAA support its interpretation of
section 171.001(b). Section 171.022 provides that a "court may not enforce an agreement
to arbitrate if the court finds the agreement was unconscionable at the time the agreement
was made." Tex. Civ. Prac. & Rem. Code Ann. § 171.022 (Vernon Supp. 2003) 
(emphasis added). Tri-Star argues that the emphasized language indicates that the only
valid defenses to arbitration are those relating to the formation of the arbitration
agreement. But section 171.022 applies only to the defense of unconscionability; we
decline to import its language into section 171.001(b).

 Section 171.021(b) provides that if a party opposing a motion to compel arbitration
"denies the existence of the agreement," the court must determine that issue and compel
arbitration if it finds that an agreement exists. Id. § 171.021(b). Tri-Star suggests that an
arbitration agreement "exists" in the absence of defects in its formation. We disagree. If
a contract is revoked as the result of a material breach, it effectively no longer exists.

 Relying on sections 171.088 and 171.089, Tri-Star argues that a material breach
cannot render an arbitration agreement unenforceable because the sole statutory remedy
for misconduct during the course of arbitration proceedings is to vacate the arbitration
award and compel further arbitration. Section 171.088 provides that a court "shall
vacate" an arbitration award under certain circumstances, including when the award was
obtained by "undue means." Id. § 171.088(a)(1) (emphasis added). In this case, the trial
court found that the arbitration award was obtained by undue means. Section 171.089
provides that when a court vacates an arbitration award it "may order a rehearing before
new arbitrators." See id. § 171.089(a) (emphasis added). Tri-Star argues that section
171.089 required the trial court to compel re-arbitration after vacating the Ernst & Young
report. A case from the San Antonio Court of Appeals supports this argument. See Koch
v. Koch, 27 S.W.3d 93, 97 (Tex. App.--San Antonio 2000, no pet.).

 In Koch, the trial court vacated an arbitration award and set the case for trial. 27
S.W.3d at 95. The appellate court held that the trial court erred in setting the case for trial
because section 171.089 "does not provide language that allows the court to set the case
for trial." Id. at 97. The court rejected the argument that the word "may" in the statute
conferred discretion to set the case for trial because "the statute is silent on whether this
grant of discretion includes the right to order the parties to trial when the arbitration is
vacated." Id.

 Unless the Legislature clearly intended otherwise, words used in statutes should be
given their ordinary, reasonable meaning. Wright v. Ector County Indep. Sch. Dist., 867
S.W.2d 863, 868 (Tex. App.--El Paso 1993, no writ). The ordinary meaning of "shall" is 
mandatory, whereas the ordinary meaning of "may" is permissive. Id. We infer from the 
use of "shall" in some sections of the TAA and "may" in others that the Legislature
intended different meanings to attach to these words. See id.; see also Tex. Civ. Prac. &
Rem. Code Ann. § 171.091 (setting forth the circumstances in which a court "shall"
modify an arbitration award). Therefore, we decline to follow Koch. Instead, we
interpret the word "may" in section 171.089(a) in its ordinary, reasonable, permissive
sense. The statute thus did not require the trial court to order re-arbitration.

 Tri-Star argues that federal cases support its argument that re-arbitration is the only
remedy for misconduct during arbitration proceedings. In Major League Baseball
Players Ass'n v. Garvey, the appellate court vacated an arbitration award because it
disagreed with the factual findings of the arbitration panel. 532 U.S. 504, 507-08, 121
S.Ct. 1724, 1727, 149 L.Ed.2d 740 (2001). Based on its review of the record before the
panel, the appellate court remanded with instructions for the panel to enter an award in
favor of the appellant. Id. at 508, 121 S.Ct. at 1727. The Supreme Court held that the
appellate court erred by vacating the award simply because it disagreed with the
arbitration panel's findings. Id. at 510, 121 S.Ct. at 1728-29. The appellate court also
erred by resolving the merits of the case based on the court's assessment of the record
before the arbitration panel. Id. at 510-11, 121 S.Ct. at 1729. In this context, the
Supreme Court stated, "Even when the arbitrator's award may properly be vacated, the
appropriate remedy is to remand the case for further arbitration proceedings." Id. at 511,
121 S.Ct. at 1729; see also Foster v. Turley, 808 F.2d 38, 43 (10th Cir. 1986) ("[I]f the
district court . . . determines . . . that the award must be vacated . . . the court may not then
decide the merits of the controversy . . . [but] may only consider whether . . . a remand to
the arbitrators for rehearing is appropriate.").

 The issue of material breach was not raised in Garvey or Foster. Because the
courts therefore did not address the proper remedy for misconduct that amounts to a
material breach of an arbitration agreement, we find these cases unhelpful to our decision.

 Finally, Tri-Star alludes to the public policy favoring arbitration. See Prudential
Secs. Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995). Tri-Star argues that this policy
would be thwarted by a ruling that parties may avoid further arbitration because of
misconduct in the arbitration process. Tri-Star suggests that such a ruling would
encourage litigation by parties who are dissatisfied with the course or outcome of
arbitration.

 One of the justifications for the public policy favoring arbitration is the perception
that it provides a more efficient and economical system of resolving disputes than
litigation. See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 268 (Tex. 1992). If we
adopted Tri-Star's arguments, trial courts would have no choice but to compel re-arbitration after re-arbitration, regardless of whether one of the parties committed
egregious and repeated misconduct in the course of the earlier arbitration proceedings. 
We fail to see how this would result in the efficient and economical resolution of
disputes.

 Tri-Star's first issue is overruled.

SUFFICIENCY OF THE EVIDENCE

 Whether a party's breach of contract is so material as to render the contract
unenforceable is a question of fact to be determined by the trier of fact--in this case, the
trial court. Hudson v. Wakefield, 645 S.W.2d 427, 430 (Tex. 1983); Driver Pipeline Co.
v. Mustang Pipeline Co., 69 S.W.3d 779, 789 (Tex. App.--Texarkana 2002, pet. filed). 
In its second issue, Tri-Star argues that the evidence is insufficient to support most of the
trial court's findings of fact and that those findings with evidentiary support are
irrelevant. As the parties acknowledge, we apply a "no evidence" standard in reviewing
factual questions concerning an order denying arbitration. Fridl, 908 S.W.2d at 511; see
also Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co., 849 S.W.2d 380, 384
(Tex. App.--Houston [14th Dist.] 1993, writ denied) ("Though appellants style this point
of error . . . as 'no evidence' and 'insufficient evidence,' the proper standard of review in
an appeal from an interlocutory order concerning a motion to stay litigation and compel
arbitration is simply 'no evidence.'").

 In performing a "no evidence" review, we consider the evidence in the light most
favorable to the prevailing party, indulging every reasonable inference in that party's
favor. St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 519 (Tex. 2002); Hearthshire
Braeswood, 849 S.W.2d at 384. Although it is often said that we must disregard all
evidence contrary to the finding in question, we need not disregard undisputed evidence
that allows of only one logical inference. St. Joseph Hosp., 94 S.W.3d at 519-20. (5)

Findings Two, Four, and Five

 Tri-Star first attacks findings two, four, and five. In finding two, the trial court
stated, "Tri-Star engaged in a conscious effort to exclude Tipperary and the Intervenors
from knowledge of and access to Ernst & Young Australia." In finding four, the court
stated, "Ernst & Young Australia had knowledge of the applicability of the [TAA] to the
proceedings, and had legal counsel in Australia to advise of the [TAA's] statutory
requirements." And in finding five, the court stated, "Ernst & Young Australia did not
comply with the terms of the [TAA]."

 The record contains the following evidence that supports finding two. On
February 5, 1997, Tipperary sent a letter to Tri-Star's president, James Butler, Sr., asking,
"Has the 'Big Six' accounting firm been engaged . . .? If not, when will this happen? It
has been almost a year since our lawsuit settlement, and we still don't have this
accomplished." (6) On February 20, 1997, Tri-Star hired Ernst & Young. The letter of
engagement between Tri-Star and Ernst & Young prohibited Ernst & Young from
disclosing information about the Comet Ridge Project to third parties without Tri-Star's
permission. Tim Eddy, the Ernst & Young partner in charge of this matter, testified that
this provision prohibited him from conveying information to Tipperary or the intervenors.

 On April 3, 1997, Tri-Star informed Tipperary that it had hired Ernst & Young. 
On April 9, 1997, Tipperary's counsel complained to Tri-Star's representative that
Tipperary had "heard nothing of the activity of Ernst & Young."

 In September 1997, Tipperary sent James Sr. a letter, asking why it was not being
kept informed about the status of the audit, and Craig, Ltd. sent James Sr. a letter
requesting the names and addresses of the Ernst & Young accountants who were doing
the work.

 In December 1997, counsel for Tipperary and the intervenors requested that Tri-Star's counsel provide the names of the accountants so that they could confer with the
accountants about issues they deemed important. Tri-Star's counsel refused, stating, "Tri-Star feels that it would be a breach either of the express or implied terms of the
engagement of the auditors to divulge the name of the person doing the work until it is
complete." Counsel for Tipperary and the intervenors then sent Tri-Star's counsel a letter
stating:

 There is absolutely nothing in the [Mediation] Agreement that would
support [Tri-Star's] position. Undoubtedly, there have been
communications between Tri-Star employees and the auditor. It seems
imminently fair for my clients, since they are paying part of the bill for the
auditor, to also have an opportunity to talk to the auditor, if for no other
reason, so that they will be confident that when he does render his report it
is truly an objective, unbiased report.


 Despite Tri-Star's recalcitrance, Tipperary managed to find out the names of the
accountants. In May 1998, Tipperary faxed a letter to Ernst & Young, inquiring about the
status of the report. Ernst & Young forwarded the letter to James Jr., with a memo
stating, "We need to reply to this fax, in light of our previous conversations on these
matters, please can you advise us on how to respond." Ernst & Young eventually
responded to Tipperary's fax by stating that it was nearing completion of the audit and
advising, "Should you have any queries about the recent delays or any other queries
please contact Mr. Jim Butler."

 In June 1998, Tipperary again requested a status report from Ernst & Young, and
Ernst & Young responded by stating, "[W]e have been instructed by Tri-Star that all
queries . . . should be directed straight to Mr. Jim Butler . . . ."

 In September 1998, Tipperary's counsel sent a letter to Ernst & Young requesting
that the report be sent immediately, along with an explanation for the delay. James Jr.
instructed Ernst & Young to respond to this request "by telling them to get in touch with
us." Ernst & Young followed this instruction.

 In an effort to explain Tri-Star's refusal to tell Tipperary or the intervenors the
names of the accountants, James Sr. testified that it would have been "unusual" to do so
in a normal audit situation. He further testified that it would have been "very confusing"
to the accountants to have more than one entity communicating with them, and that such
communications would have "interfered" with the accountants' work. James Jr. testified
that based on his interpretation of the mediation agreement, Tipperary and the intervenors
had no right to participate in the process with Ernst & Young. Tipperary's president, on
the other hand, testified that he never intended for Tri-Star to participate in Ernst &
Young's decision-making process to the exclusion of Tipperary.

 Tri-Star argues that the evidence conclusively establishes that none of the parties
expected Tipperary and the intervenors to participate in the arbitration process. Tri-Star
points out that Tipperary and the intervenors did in fact communicate with Ernst &
Young several times, but never requested a hearing or an opportunity to participate. 
Instead, they were only interested in obtaining Ernst & Young's report. Although there is
no evidence that Tipperary or the intervenors requested a hearing, the evidence recounted
above, particularly the attorney's December 1997 letters, indicates that they did attempt to
participate in the process. The trial court could have inferred from this evidence that
"Tri-Star engaged in a conscious effort to exclude Tipperary and the Intervenors from
knowledge of and access to Ernst & Young Australia."

 The record contains the following evidence that supports finding four. Pursuant to
the arbitration agreement, Tri-Star's representative sent requests for expressions of
interest to several accounting firms, including Ernst & Young. The requests quoted the
arbitration agreement in its entirety and stated that the accounting services were needed as
a result of the mediation agreement. Thus, the requests stated that the accounting firm's
determination would be final, binding, and enforceable under "'the Arbitration Statute of
the State of Texas.'" Eddy testified that he was aware that this language was in the
arbitration agreement and in the request.

 Ernst & Young responded to the request with a written expression of interest that
referenced the mediation agreement. After Ernst & Young had been working on the
report for over a year, Tri-Star began to question whether Ernst & Young had correctly
interpreted the arbitration agreement. Ernst & Young therefore asked an Australian law
firm to determine its proper interpretation. After reviewing the mediation agreement, the
law firm advised Ernst & Young on the proper interpretation and noted "that the
Mediation Agreement is expressed to be governed by the laws of the State of Texas." 
This evidence is sufficient to support the trial court's finding that Ernst & Young knew
the TAA applied to the proceedings and that it had Australian counsel to advise of the
TAA's requirements.

 As for finding five, we noted in Tri-Star I that it is undisputed that Tipperary was
not afforded a hearing, an opportunity to present evidence, or other rights guaranteed by
the TAA. 2001 WL 175533, at *2 n.4; see also Tex. Civ. Prac. & Rem. Code Ann. §§
171.043-.051 (Vernon Supp. 2003). Indeed, Tri-Star stipulated before the trial court that
Ernst & Young did not conduct a hearing. The evidence is thus sufficient to support the
court's finding that Ernst & Young did not comply with the TAA.

 Tri-Star argues that findings four and five are correct only when viewed with the
benefit of hindsight because at the time Ernst & Young was doing its work, the parties
had the common understanding that the procedural requirements of the TAA did not
apply. (7) Although there is some evidence to support this argument, the evidence does not
negate the evidence that Ernst & Young was aware of the arbitration agreement's
provision that its determinations would be enforceable under the TAA. We also note that
findings four and five, insofar as they relate only to Ernst & Young's conduct, are only
marginally relevant to the ultimate issue in this case, i.e., whether Tri-Star's misconduct
amounted to a material breach of the arbitration agreement.

Findings One, Three, and Eight

 Next, Tri-Star attacks findings one, three, and eight. Finding one is "Tri-Star
engaged Ernst & Young Australia not as a neutral arbitrator, but in the capacity as its own
accounting firm." Finding three is "Ernst & Young Australia acted in strict loyalty to Tri-Star, acknowledging their roles as client and accountant." And finding eight is "Tri-Star
exercised undue influence over the role of Ernst & Young Australia as a neutral
arbitrator, substantially affecting the objectivity of the auditing methods and the final
report."

 Regarding findings one and three, we have already noted that Ernst & Young
followed Tri-Star's instructions on how to respond to requests for information from
Tipperary and the intervenors. This indicates that Ernst & Young considered Tri-Star to
be its sole client. This interpretation is confirmed by Eddy, who testified that Ernst &
Young viewed its relationship with Tri-Star as one of accountant and client. Another
Ernst & Young accountant testified that "[o]ur engagement from an ethical point of view
was with Tri-Star."

 To evaluate finding eight, it is necessary to review the process through which Ernst
& Young developed its report. In its expression of interest, Ernst & Young noted that it
believed the arbitration agreement was open to interpretation. It therefore provided the
following explanation of how it interpreted the agreement:

 Paragraph 7B uses the phrase ". . . international accounting procedure forms
. . .". From our discussions we understand that the word "forms" appears to
be a direct quote from the AIPN Model Form International Accounting
Procedure. Whilst we appreciate that this is a specific document, we
believe that the spirit of this paragraph will involve us looking beyond "pro
forma documents" and drawing on our experience as well as the written
documents used by our own clients on a local and international basis. . . .


 Paragraph 7C asks us to "Select an international accounting procedure . . .". 
We have interpreted this to mean that we will need to prepare an
appropriate document based on the results of 7B (rather than simply
selecting one of a number of pro forma documents) which will be used as a
supplement to the operating Agreement."


The letter of engagement incorporated by reference this interpretation of the arbitration
agreement. By the time the letter was drafted, Ernst & Young had determined that the
only international accounting form for oil and gas operations was one developed by the
Association of International Petroleum Negotiators. The parties refer to this form as the
"AIPN."

 In accordance with the letter of engagement, Ernst & Young began creating a
supplement to the Comet Ridge operating agreement. This supplement would then enable
Ernst & Young to determine which expenses Tri-Star had properly charged to the joint
account. The record contains ample evidence that representatives of Tri-Star, including
the Butlers, had substantial input in the development of the supplement and in Ernst &
Young's decisions about which expenses were properly chargeable to the joint account. 
In some cases, Ernst & Young adopted Tri-Star's proposed rewrites of the supplement.

 Eddy testified that Tri-Star urged Ernst & Young to adopt a broad definition of
what could be charged to the joint account. James Jr. admitted that he attempted to
convince Ernst & Young that certain categories of expenses, such as marketing, should be
charged to the joint account.

 Tri-Star also urged Ernst & Young to evaluate not only whether the expenses Tri-Star had already charged to the joint account were proper, but also whether Tri-Star could
have charged additional expenses to the joint account. Believing that this was an
incorrect interpretation of the arbitration agreement, Eddy consulted Ernst &Young's
Australian attorneys about the matter. The attorneys agreed with Eddy that Ernst &
Young should only determine whether the expenses that had already been charged were
proper. Nevertheless, Eddy acquiesced to Tri-Star's interpretation. Ernst & Young's
final report noted that Tri-Star could have charged an additional $260,000 to the joint
account. Eddy testified that he did not "recall . . . why I got to being able to include [the
additional expenses] in my report."

 After working on the supplement for over a year, Ernst & Young was ready to
release its final report in April 1998. That month, James Sr. contacted one of the Ernst &
Young accountants to complain that the proposed final report disallowed too many of the
expenses Tri-Star had charged to the joint account. During this conversation, James Sr.
informed the accountant that he believed Ernst & Young should not have created a
supplement to the operating agreement. Instead, he argued that the arbitration agreement
required Ernst & Young to select an already existing form.

 Shortly after this conversation, James Jr. forwarded to Ernst & Young a written
opinion on this issue from Tri-Star's Texas attorneys. The Texas attorneys agreed with
James Sr. that Ernst & Young should have selected a form instead of creating its own
supplement. In his cover letter to Ernst & Young, James Jr. suggested that there could be
serious repercussions for Ernst & Young if it failed to adopt this interpretation of the
arbitration agreement. The letter stated that the Texas attorneys were "concerned that
[Ernst & Young's report] does not satisfy the specific language of the Mediation
Agreement. . . . We have been further advised that failure to follow the Court-sanctioned
agreement could be seen by the Court as an action by Tri-Star and Ernst & Young in
contempt of the Court's own order."

 The Ernst & Young accountants believed that they had acted appropriately in
creating a supplement for several reasons. James Jr. had signed the letter of engagement,
which incorporated Ernst & Young's interpretation of the arbitration agreement. 
Moreover, considering Tri-Star's substantial involvement in the creation of the
supplement, the accountants believed that it should have been obvious to Tri-Star that
Ernst & Young had been creating a supplement for the past year. The accountants had
spent a great amount of time doing benchmarking studies, as required by the arbitration
agreement, to determine how other entities dealt with the issues covered by the arbitration
agreement. The accountants testified that there was no reason for them to do the
benchmarking studies if they were simply going to adopt the only existing form, the
AIPN. The accountants also testified that they did not believe the AIPN was an
appropriate form for the Comet Ridge Project. The arbitration agreement specifically
directed them to select an accounting procedure to supplement the "direct charges"
provisions of the operating agreement. The AIPN, however, contained no definition of
what should be a "direct charge."

 Ernst & Young consulted with its Australian attorneys to determine how it should
proceed in light of Tri-Star's eleventh hour claim that it had misinterpreted the arbitration
agreement. The Australian attorneys issued a written opinion, stating that Ernst & Young
had "properly performed its obligations" and that "the terms of the engagement entitle[d]
[Ernst & Young] to give a more liberal and practical approach to the [arbitration
agreement] than the stricter interpretation now required by Tri-Star Petroleum." 
Nevertheless, because the arbitration agreement was "ambiguous and disjointed" and
"[i]n view of [its] litigious background," the Australian attorneys concluded that it should
be strictly construed to require Ernst & Young to select an existing form, rather than to
create a supplement. The Australian attorneys stressed, "It is . . . important to note that
the Mediation Agreement is expressed to be governed by the laws of the State of Texas
and therefore the opinion of the Texas Attorneys should be deferred to on matters of legal
interpretation." Based on this advice, Ernst & Young agreed to scrap the supplement that
it had been developing for over a year and to adopt the AIPN.

 In their written opinion, the Texas attorneys stated that if Ernst & Young created a
supplement rather than adopting an existing form, "the settling parties may well argue
that [creating the supplement] was not within the mandate" of the arbitration agreement. 
It is undisputed that neither Ernst & Young nor Tri-Star contacted any of these "settling
parties," such as Tipperary, to determine if their interpretation of the arbitration
agreement jibed with that of Tri-Star's Texas attorneys.

 The testimony of the Ernst & Young accountants indicates that adoption of the
AIPN was favorable to Tri-Star. For example, pursuant to the supplement they created,
time spent on administrative work was not always billed to the joint account. But under
the AIPN, all of this time could be billed to the joint account. As of March 1998, just
before it was about to issue its final report, Ernst & Young had determined that Tri-Star
inappropriately charged approximately $132,000 to the joint account. But the final report
that was actually released in October 1998, after Ernst & Young adopted the AIPN,
concluded that Tri-Star had inappropriately charged only $7,700. And as noted above,
Ernst & Young also concluded in the final report that Tri-Star could have charged an
additional $260,000 to the joint account.

 From this evidence, the trial court could have inferred that Tri-Star not only
supplied Ernst & Young with the raw data that it needed to complete its report, but also
attempted to influence Ernst & Young's decisions. The evidence also reflects that Tri-Star was successful in changing Ernst & Young's decisions on some crucial issues. The
court could have inferred that Tri-Star's influence was "undue" in light of Tri-Star's
efforts to shut Tipperary and the intervenors out of Ernst & Young's decision-making
process and in light of James Sr.'s own testimony that Ernst & Young was acting in a
"judgmental capacity and shouldn't be interfered with . . . [b]y anybody." 

 Tri-Star argues that Ernst & Young conducted a rigorous and fair evaluation and
that it exercised its independent judgment. Tri-Star points out that Ernst & Young
challenged many of the expenses charged to the joint account. The final report
disallowed some of these expenses, and Tri-Star withdrew others as a result of Ernst &
Young's questions. Both the Ernst & Young accountants and a CPA who evaluated their
work testified that Ernst & Young exercised independent professional judgment. Tri-Star
also notes that Ernst & Young contacted its own counsel before deciding to abandon the
supplement and adopt the AIPN. And Tri-Star argues that as a small, family-owned
company, it was in no position to exercise undue influence over Ernst & Young, which
was a Big Six accounting firm. Nevertheless, the evidence recited above is more than
sufficient to support findings that "Tri-Star engaged Ernst & Young Australia not as a
neutral arbitrator," that Ernst & Young acted in loyalty to Tri-Star, and that "Tri-Star
exercised undue influence" over Ernst & Young, "substantially affecting the objectivity
of the auditing methods and the final report."

Findings Nine and Ten

 Tri-Star next argues that the evidence does not support findings nine and ten. In
finding nine, the trial court stated, "Not only was the neutrality of the arbitration
proceeding adversely affected by Tri-Star, but the efficacy of the entire process of [the
arbitration agreement] was irretrievably compromised by Tri-Star's conduct." In finding
ten, the court stated, "Tipperary was deprived of the benefits it reasonably expected
would flow from a valid arbitration procedure--resolution of the billing disputes."

 The evidence that supports the findings of undue influence and exclusion of others
from the arbitration process also supports a finding that the efficacy of the process was
irretrievably compromised. And the fact that Ernst & Young's report had to be vacated
supports the finding that Tipperary was deprived of a resolution of the disputes.

 One of the factors that a court may consider in determining the materiality of a
breach is the extent to which the nonbreaching party will be deprived of the benefit that it
could have reasonably anticipated from full performance. Hernandez, 875 S.W.2d at 693;
Restatement (Second) of Contracts § 241(a) (1981). Tri-Star argues that because
the trial court has determined that the TAA's procedural requirements apply to the
arbitration agreement, re-arbitration would secure for Tipperary the benefit it reasonably
anticipated from the arbitration agreement, i.e., a fair resolution of the billing disputes. 
Tri-Star also notes that Tipperary has already received other benefits from the mediation
agreement, such as the cure of the forfeiture of interest that Tri-Star asserted against
Tipperary in the suit that resulted in the mediation agreement.

 Tipperary's president testified that he entered into the arbitration agreement
because he believed it would lead to an impartial, speedy, and inexpensive resolution of
the controversy. Now, more than six years and two appeals later, the underlying
controversy is still not resolved. Tri-Star did not send the requests for expressions of
interest to the Big Six accounting firms until over eight months after the mediation
agreement was signed. Although Ernst & Young estimated that it would take just over
two months to issue its final report, it actually took more than a year and a half. At least
part of this delay was attributable to the fact that Tri-Star initially went along with Ernst
& Young's decision to develop a supplement, but then insisted that Ernst & Young adopt
the AIPN just as Ernst & Young was about to issue its final report. Tipperary's president
testified that it was important to Tipperary to resolve the controversy quickly for
budgeting and planning purposes. He also testified that the protracted nature of the
controversy complicated Tipperary's reports to the SEC, lenders, and investors.

Tipperary has paid Ernst & Young over $75,000. Tipperary's president estimated that in
addition to Ernst & Young's fees, Tipperary had spent over one million dollars in trying
to resolve the disputes encompassed by the arbitration agreement. From all this
evidence, the trial court could have inferred that the efficacy of the arbitration process had
been irretrievably compromised and that it is now impossible for Tipperary to obtain the
benefit it reasonably anticipated from the arbitration agreement--a speedy and inexpensive
resolution of the controversy.

Findings Six and Seven

 Tri-Star argues that findings six and seven are irrelevant. In finding six, the trial
court stated, "The arbitration process was extremely long, costly and inefficient." And in
finding seven, the trial court stated, "Valuable productive time in the drilling program
was lost because of the flawed arbitration process." Tri-Star notes that whenever an
arbitration award is vacated, there will inevitably be additional delays, costs, and
inefficiencies. We agree that mere delay, cost, and inefficiency alone do not justify a
court in refusing to enforce an arbitration agreement. Here, however, the extent of the
delay, cost, and inefficiency is a result of Tri-Star's misconduct. We therefore conclude
that findings six and seven are relevant.

 Tri-Star's second issue is overruled.

Ruling on the Post-1995 Disputes

 In its order, the trial court refused to compel arbitration of the post-1995 disputes. 
Tri-Star argues in its third issue that the court erred by ruling on these disputes because
the only issue before the court was Tri-Star's motion to compel re-arbitration of the 1994-95 disputes. But as Tri-Star acknowledges, arbitration of the post-1995 disputes is
dependent upon a determination of the 1994-95 disputes, and the post-1995 disputes are
not ripe for decision unless and until there has been another arbitration of the 1994-95
disputes. Pursuant to the trial court's order, there will not be another arbitration of the
1994-95 disputes. Consequently, there can be no arbitration of the post-1995 disputes. 
We therefore conclude that the trial court did not err by ruling on the post-1995 disputes.

 Tri-Star's third issue is overruled.

CONCLUSION

 For the reasons stated herein, the order of the trial court is affirmed.


 SUSAN LARSEN, Justice

May 29, 2003


Before Panel No. 1

Larsen, McClure, and Chew, JJ.

1. In January 1999, a majority of the non-operating interest owners voted to remove Tri-Star as operator and selected Tipperary as successor operator. Tri-Star Petroleum Co. v.
Tipperary Corp., 101 S.W.3d 583, 586 (Tex. App.--El Paso 2003, no pet.). The trial court issued
a temporary injunction requiring Tri-Star to cease acting as operator. See id. at 587. We
affirmed the temporary injunction order. See id. at 586.
2. We will refer to these provisions of the mediation agreement as the "arbitration
agreement." In October 1996, Tri-Star entered into a similar arbitration agreement with
Appellees Craig, Ltd. and W.D. Kennedy.
3. Following the trial court's terminology, we will refer to the disputes that arose before the
parties signed the mediation agreement as "the 1994-95 disputes" and to the disputes that arose
after the mediation agreement as "the post-1995 disputes."
4. Craig, Ltd. and W.D. Kennedy eventually intervened in the suit.
5. The scope of review is determined by whether findings of fact were requested and filed. 
Generally, when findings of fact were not requested or filed, we affirm the trial court's decision
if there is evidence to support any legal theory asserted by the prevailing party. See, e.g.,
Hearthshire Braeswood, 849 S.W.2d at 384. But when findings of fact are filed, our review is
limited to those findings. See Tex. R. Civ. P. 299; Walnut Equip. Leasing Co. v. J-V Dirt &
Loam, 907 S.W.2d 912, 917 (Tex. App.--Austin 1995, writ denied). Findings of fact must be
separately filed and "shall not be recited in a judgment." Tex. R. Civ. P. 299a. In this case,
neither party filed a formal request for findings of fact, but the trial court included findings in its
order in violation of Rule 299a. It is unclear what effect should be given to findings in this
situation. See id. (providing that if there is a conflict between findings recited in a judgment and
separately filed findings, the separately filed findings control); In re Castillo, 101 S.W.3d 174,
179 (Tex. App.--Amarillo 2003, no pet. h.) (holding, where findings of fact were not requested or
filed, that the inclusion of findings in the judgment did not foreclose the appellate court's
obligation to consider whether the record supported the trial court's decision on other grounds);
Tate v. Tate, 55 S.W.3d 1, 7 n.4 (Tex. App.--El Paso 2000, no pet.) (holding that the party who
drafted a judgment containing findings of fact waived any complaint about the invalidity of those
findings); Frommer v. Frommer, 981 S.W.2d 811, 814 (Tex. App.--Houston [1st Dist.] 1998,
pet. dism'd) (stating that findings recited in a judgment cannot form the basis of a claim on
appeal); Hill v. Hill, 971 S.W.2d 153, 157 (Tex. App.--Amarillo 1998, no pet.) (holding that
findings in a judgment should be given effect if no one complained of the error and the findings
do not conflict with separately filed findings). We need not resolve this question. Even if we
limit our review to the grounds for the decision recited in the order, we conclude that the trial
court's decision is supported by the evidence. Therefore, we need not consider whether evidence
supports any other grounds for the decision.
6. Butler's son, James Butler, Jr., is the vice-president of Tri-Star. To avoid confusion, we
will refer to the Butlers as "James Sr." and "James Jr."
7. Tri-Star does not challenge the trial court's determination that the TAA's procedural
requirements apply to the arbitration agreement. In its brief, it expressly accepts this
determination.