**TRI–STAR PETROLEUM COMPANY,**
Appellant,

v.

**TIPPERARY CORPORATION, Tipperary Oil & Gas Corporation, Tipperary Oil & Gas (Australia) Pty Ltd., Craig, Ltd., and W.D. Kennedy, Appellees.**

No. 08–02–00305–CV.

Supreme Court of Texas.

May 29, 2003.

Rehearing Overruled July 2, 2003.

608

Roger B. Greenberg, Schwartz, Junell, Campbell & Oathout, L.L.P., Ben H. Sheppard Jr., Vinson & Elkins, L.L.P., Houston, Steven C. Kiser, Lynch, Chappell & Alsup, Midland, for Appellant.

Charles Tighe, Cotton, Bledsoe, Tighe & Dawson, Midland, James E. Essig, Webster, Leslie G. McLaughlin, Midland, Deborah E. Taylor, Glast, Phillips & Murray, Houston, James V. Hammett, Jr., Lampasas, for Appellees.

Before Panel No. 1 LARSEN, McCLURE, AND CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

This is an interlocutory appeal from an order denying a motion to compel arbitration. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an operating agreement that governs a natural gas project in Australia known as the Comet Ridge Project. Tipperary Corporation, Tipperary Oil & Gas Corporation, and Tipperary Oil & Gas (Australia) Pty Ltd. (collectively "Tipperary") are non-operating interest owners under the operating agreement. At the time of the events giving rise to this suit, Tri–Star Petroleum Company was the operator.[1]

Exhibit C to the operating agreement provides that the operator may charge certain expenses relating to the Comet Ridge Project to a joint account and that the non-operating interest owners will pay proportionate shares of these charges. After a few years of operations, a dispute arose between Tri–Star and Tipperary about Tri–Star's charges to the joint account. This dispute evolved into a lawsuit filed by Tri–Star against Tipperary. The parties settled this suit by entering into a mediation agreement on May 2, 1996.

The mediation agreement contained the following provisions for the resolution of the joint account dispute:

7. As to the existing joint interest billing audits, it is agreed that Tri–Star shall hire for the joint account a "Big Six" accounting firm familiar with international petroleum operations to do the following:

A. Review the nature of the Comet Ridge Project;

B. Study and consider the various international accounting procedure forms available, their own clients' practices and consider any other benchmark studies they may have conducted or have access to;

C. Select an international accounting procedure containing expense categories that, when used as a sup-

---

1. In January 1999, a majority of the non-operating interest owners voted to remove Tri–Star as operator and selected Tipperary as successor operator. *Tri–Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 586 (Tex. App.-El Paso 2003, no pet.). The trial court issued a temporary injunction requiring Tri–Star to cease acting as operator. *See id.* at 587. We affirmed the temporary injunction order. *See id.* at 586.

plement to "DIRECT CHARGES" of Exhibit "C" II to the Operating Agreement, is best suited to the Comet Ridge Project operations; and

D. Determine which expenses shall be considered properly chargeable expenditures under the Operating Agreement considering the provisions of the Operating Agreement,7.C above and that "on the Joint Property" as used in the Operating Agreement, in the context of this project, can refer to and mean subject matter as well as geographic locality.

Such determination shall be final and binding on the parties hereto and may be enforced as [a] final judgment under the Arbitration Statute of the State of Texas.

8. Hereafter, any audit disputes that are not resolved as a result of the customary audit process will be resolved by the Big Six accounting firm named pursuant to paragraph 7 in the same manner provided in paragraph 7D above.[2]

Tri–Star hired the Brisbane, Australia office of Ernst & Young to perform the tasks contemplated by the arbitration agreement.

More than two years passed, and Ernst & Young did not issue a report. Meanwhile, new disputes over charges to the joint account arose.[3] In August 1998, Tipperary filed suit against Tri–Star, claiming Tri–Star breached the operating agree-ment and failed to complete its obligations under the arbitration agreement.[4]

In October 1998, Ernst & Young finally issued its report. Tri–Star filed a motion to confirm the report as an arbitration award. Tri–Star also filed a motion to compel arbitration of the post–1995 disputes. The trial court determined that fact issues existed as to whether Ernst & Young conducted a valid and enforceable arbitration process and that these fact issues affected Tri–Star's rights to compel arbitration and to confirmation of Ernst & Young's report. The court therefore denied the motion to compel without prejudice to Tri–Star's right to re-urge the motion after the conclusion of an evidentiary hearing. The court also held that the requirements of the Texas Arbitration Act (TAA) apply to all arbitrations conducted under the arbitration agreement.

Tri–Star appealed the denial of its motion to compel to this Court. *See Tri–Star Petroleum Co. v. Tipperary Corp.*, No. 08–00–00217–CV, 2001 WL 175533, at *1 (Tex. App.-El Paso Feb.22, 2001, no pet.) (not designated for publication) [hereinafter *Tri–Star I* ]. To resolve the issues raised on appeal, we found it necessary to determine what issues may be raised and considered in a motion to compel arbitration. *See id.* at *3. We stated:

[I]n its response to Tri–Star's motion to compel arbitration, Tipperary asserted that Tri–Star's tampering with the arbitration process constituted a material breach of the arbitration agreement which rendered the agreement unenforceable. The trial court granted, al-

---

**2.** We will refer to these provisions of the mediation agreement as the "arbitration agreement." In October 1996, Tri–Star entered into a similar arbitration agreement with Appellees Craig, Ltd. and W.D. Kennedy.

**3.** Following the trial court's terminology, we will refer to the disputes that arose before the parties signed the mediation agreement as "the 1994–95 disputes" and to the disputes that arose after the mediation agreement as "the post–1995 disputes."

**4.** Craig, Ltd. and W.D. Kennedy eventually intervened in the suit.

beit in a limited fashion, Tipperary's objections to the motion to confirm and motion to compel, and determined that fact issues exist with respect to the validity of the arbitration process. The trial court concluded that the existence of these fact issues affected not only the decision to confirm the award, but also whether arbitration of the [post–1995 disputes] should be compelled. We agree with the trial court's conclusion. *If Tipperary's allegations regarding corruption, fraud, tampering, and other undue means on the part of Tri–Star and the arbitrator are later established, and it establishes that these facts render the arbitration agreement unenforceable, the trial court could not only vacate the award, but under certain circumstances could also refuse to compel arbitration.*

*Id.* at *5 (emphasis added). We affirmed the trial court's order. *See id.* at *6.

Back in the trial court, Tri–Star stipulated that the Ernst & Young report should be vacated because no hearing was conducted as required by the TAA. But Tri–Star also requested the trial court to compel re-arbitration of the 1994–95 disputes. Tipperary objected to re-arbitration.

After a three-day evidentiary hearing, the court issued an order finding that Tri–Star hired Ernst & Young not as a neutral arbitrator, but in the capacity of its own accounting firm; Tri–Star engaged in a conscious effort to exclude Tipperary from access to Ernst & Young; Ernst & Young did not comply with the TAA and acted in strict loyalty to Tri–Star; the arbitration process was extremely long, costly, and inefficient; valuable productive time in the drilling program was lost because of the flawed arbitration process; Tri–Star exercised undue influence over Ernst & Young; the "efficacy of the entire [arbitration] process ... was irretrievably compromised by Tri–Star's conduct;" and Tipperary was deprived of the benefits it reasonably expected would flow from the arbitration process. Based on these findings, the court determined that the Ernst & Young report was obtained by "undue means" and that the arbitration agreement "is rendered no longer enforceable due to the material breach by Tri–Star and the participation in that conduct by Ernst & Young." Accordingly, the court vacated the Ernst & Young report as an arbitration award and refused to compel re-arbitration of the 1994–95 disputes or arbitration of the post–1995 disputes. Tri Star now appeals from this order.

## MATERIAL BREACH AS A GROUND FOR REVOKING AN ARBITRATION AGREEMENT

■ In its first issue, Tri–Star argues that misconduct, no matter how egregious, during arbitration proceedings can never provide a basis for revoking an arbitration agreement. Tipperary argues, and the trial court found, that Tri–Star's misconduct amounted to a material breach of the arbitration agreement. Therefore, the first question we must answer is whether material breach is a valid ground for revoking an arbitration agreement. This is a question of law, which we determine *de novo.* *See Fridl v. Cook,* 908 S.W.2d 507, 511 (Tex.App.-El Paso 1995, writ dism'd w.o.j.). For the reasons explained below, we answer the question in the affirmative.

■ Because arbitration is a creature of contract, we apply standard contract principles to determine the enforceability of arbitration agreements. *See Prima Paint Corp. v. Flood & Conklin Mfg.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 1806 n. 12, 18 L.Ed.2d 1270 (1967); *Ysleta Indep. Sch. Dist. v. Godinez,* 998 S.W.2d 700, 702 (Tex.App.-El Paso 1999, no pet.). "A fun-

damental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 692 (Tex. 1994). Thus, because material breach is a ground for revoking a contract, it should be a ground for revoking an arbitration agreement.

The language of the TAA supports this outcome. The TAA provides, "A party may revoke the agreement [to arbitrate] only on a ground that exists at law or in equity for the revocation of a contract." TEX. CIV. PRAC. & REM.CODE ANN. § 171.001(b) (Vernon Supp.2003). As stated above, material breach is a ground for revoking a contract.

Tri–Star asserts that the only grounds for revoking an arbitration agreement under section 171.001(b) are contract formation defenses, such as lack of consideration, mistake, and duress. Tri–Star claims that these are the only grounds that have been addressed in cases construing section 171.001(b). *See, e.g., J.M. Davidson, Inc. v. Webster,* 49 S.W.3d 507, 512, 514 (Tex.App.-Corpus Christi 2001, pet. granted) (lack of consideration). But we are not aware of any authority limiting section 171.001(b) to contract formation defenses, and we find nothing in the statute to suggest that it should be so limited.

■ The Federal Arbitration Act (FAA) contains a provision similar to section 171.001(b). The FAA provides that an arbitration agreement may be revoked on "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (1999). Because of the similarities between the TAA and the FAA, federal arbitration cases may constitute persuasive authority for interpreting the TAA.

The Supreme Court has held that Congress enacted section 2 of the FAA "to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint,* 388 U.S. at 404 n. 12, 87 S.Ct. at 1806 n. 12; *see also Doctor's Assocs. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996). Contrary to this policy, Tri–Star's interpretation of section 171.001(b) would make arbitration agreements more enforceable than other contracts.

The parties have cited two federal appellate cases that address whether material breach may be a ground for revoking an arbitration agreement. Tri–Star relies on *Middlesex County v. Gevyn Construction Corp.,* 450 F.2d 53 (1st Cir.1971). In that case, the court rejected the argument that a material breach of an arbitration agreement renders the agreement unenforceable. Construing section 2 of the FAA, the court held that "the only grounds for revocation [of an arbitration agreement] ... are mutual agreement or a condition which vitiates [the] agreement *ab initio,* i.e., fraud, mistake, or duress." *Middlesex County,* 450 F.2d at 56.

Tipperary relies on *Hooters of America, Inc. v. Phillips,* 173 F.3d 933 (4th Cir. 1999), which reached a conclusion directly at odds with *Middlesex County.* The court held that section 2 of the FAA is not limited to "contractual formation defects such as lack of mutual assent and want of consideration." *Phillips,* 173 F.3d at 938. The arbitration agreement at issue in *Phillips* required an employer to promulgate rules under which the arbitration would be conducted. The court held that the employer materially breached the arbitration agreement by promulgating egregiously unfair rules. *See id.* Because of this material breach, the court held that the arbitration agreement was unenforceable and

affirmed the trial court's refusal to compel arbitration. *See id.* at 940–41.

Tipperary argues that this case is analogous to *Phillips:* Like the employer in that case, Tri–Star was responsible for handling how the arbitration was conducted and it failed in this duty to such an extent that it materially breached the arbitration agreement. Tri–Star responds that *Phillips* involved particularly egregious facts and that the decision should be limited to those facts. *See id.* at 941 (cautioning against reading the decision broadly as a "full-scale assault" on arbitration). Tri–Star also points out that *Phillips* is factually distinguishable from this case because, among other things, it did not involve misconduct during the course of arbitration proceedings.

We believe that the *Phillips* interpretation of section 2 of the FAA conforms more closely to the language of that statute, and to the language of section 171.001(b) of the TAA, than the *Middlesex County* interpretation does. Although *Phillips* is somewhat factually distinguishable, we rely on it merely for the legal proposition that a material breach of an arbitration agreement may provide a basis for revoking the agreement.

Tri–Star argues that other provisions of the TAA support its interpretation of section 171.001(b). Section 171.022 provides that a "court may not enforce an agreement to arbitrate if the court finds the agreement was unconscionable *at the time the agreement was made.*" Tex. Civ. Prac. & Rem.Code Ann. § 171.022 (Vernon Supp. 2003) (emphasis added). Tri–Star argues that the emphasized language indicates that the only valid defenses to arbitration are those relating to the formation of the arbitration agreement. But section 171.022 applies only to the defense of unconscionability; we decline to import its language into section 171.001(b).

Section 171.021(b) provides that if a party opposing a motion to compel arbitration "denies the existence of the agreement," the court must determine that issue and compel arbitration if it finds that an agreement exists. *Id.* § 171.021(b). Tri–Star suggests that an arbitration agreement "exists" in the absence of defects in its formation. We disagree. If a contract is revoked as the result of a material breach, it effectively no longer exists.

■ Relying on sections 171.088 and 171.089, Tri–Star argues that a material breach cannot render an arbitration agreement unenforceable because the sole statutory remedy for misconduct during the course of arbitration proceedings is to vacate the arbitration award and compel further arbitration. Section 171.088 provides that a court *"shall* vacate" an arbitration award under certain circumstances, including when the award was obtained by "undue means." *Id.* § 171.088(a)(1) (emphasis added). In this case, the trial court found that the arbitration award was obtained by undue means. Section 171.089 provides that when a court vacates an arbitration award it *"may* order a rehearing before new arbitrators." *See id.* § 171.089(a) (emphasis added). Tri–Star argues that section 171.089 required the trial court to compel re-arbitration after vacating the Ernst & Young report. A case from the San Antonio Court of Appeals supports this argument. *See Koch v. Koch,* 27 S.W.3d 93, 97 (Tex.App.-San Antonio 2000, no pet.).

In *Koch,* the trial court vacated an arbitration award and set the case for trial. 27 S.W.3d at 95. The appellate court held that the trial court erred in setting the case for trial because section 171.089 "does not provide language that allows the court to set the case for trial." *Id.* at 97. The court rejected the argument that the word

"may" in the statute conferred discretion to set the case for trial because "the statute is silent on whether this grant of discretion includes the right to order the parties to trial when the arbitration is vacated." *Id.*

■■ Unless the Legislature clearly intended otherwise, words used in statutes should be given their ordinary, reasonable meaning. *Wright v. Ector County Indep. Sch. Dist.*, 867 S.W.2d 863, 868 (Tex.App.-El Paso 1993, no writ). The ordinary meaning of "shall" is mandatory, whereas the ordinary meaning of "may" is permissive. *Id.* We infer from the use of "shall" in some sections of the TAA and "may" in others that the Legislature intended different meanings to attach to these words. *See id.; see also* TEX. CIV. PRAC. & REM.CODE ANN. § 171.091 (setting forth the circumstances in which a court "shall" modify an arbitration award). Therefore, we decline to follow *Koch.* Instead, we interpret the word "may" in section 171.089(a) in its ordinary, reasonable, permissive sense. The statute thus did not require the trial court to order re-arbitration.

Tri–Star argues that federal cases support its argument that re-arbitration is the only remedy for misconduct during arbitration proceedings. In *Major League Baseball Players Ass'n v. Garvey*, the appellate court vacated an arbitration award because it disagreed with the factual findings of the arbitration panel. 532 U.S. 504, 507–08, 121 S.Ct. 1724, 1727, 149 L.Ed.2d 740 (2001). Based on its review of the record before the panel, the appellate court remanded with instructions for the panel to enter an award in favor of the appellant. *Id.* at 508, 121 S.Ct. at 1727. The Supreme Court held that the appellate court erred by vacating the award simply because it disagreed with the arbitration panel's findings. *Id.* at 510, 121 S.Ct. at 1728–29. The appellate court also erred

by resolving the merits of the case based on the court's assessment of the record before the arbitration panel. *Id.* at 510–11, 121 S.Ct. at 1729. In this context, the Supreme Court stated, "Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings." *Id.* at 511, 121 S.Ct. at 1729; *see also Foster v. Turley*, 808 F.2d 38, 43 (10th Cir.1986) ("[I]f the district court . . . determines . . . that the award must be vacated . . . the court may not then decide the merits of the controversy . . . [but] may only consider whether . . . a remand to the arbitrators for rehearing is appropriate.").

The issue of material breach was not raised in *Garvey* or *Foster.* Because the courts therefore did not address the proper remedy for misconduct that amounts to a material breach of an arbitration agreement, we find these cases unhelpful to our decision.

■ Finally, Tri–Star alludes to the public policy favoring arbitration. *See Prudential Secs. Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex.1995). Tri–Star argues that this policy would be thwarted by a ruling that parties may avoid further arbitration because of misconduct in the arbitration process. Tri–Star suggests that such a ruling would encourage litigation by parties who are dissatisfied with the course or outcome of arbitration.

One of the justifications for the public policy favoring arbitration is the perception that it provides a more efficient and economical system of resolving disputes than litigation. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex.1992). If we adopted Tri–Star's arguments, trial courts would have no choice but to compel re-arbitration after re-arbitration, regardless of whether one of the parties committed egregious and repeated misconduct in the course of the earlier arbitration pro-

ceedings. We fail to see how this would result in the efficient and economical resolution of disputes.

Tri–Star's first issue is overruled.

## SUFFICIENCY OF THE EVIDENCE

 Whether a party's breach of contract is so material as to render the contract unenforceable is a question of fact to be determined by the trier of fact—in this case, the trial court. *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex.1983); *Driver Pipeline Co. v. Mustang Pipeline Co.*, 69 S.W.3d 779, 789 (Tex.App.-Texarkana 2002, pet. filed). In its second issue, Tri–Star argues that the evidence is insufficient to support most of the trial court's findings of fact and that those findings with evidentiary support are irrelevant. As the parties acknowledge, we apply a "no evidence" standard in reviewing factual questions concerning an order denying arbitration. *Fridl*, 908 S.W.2d at 511; *see also Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co.*, 849 S.W.2d 380,

384 (Tex.App.-Houston [14th Dist.] 1993, writ denied) ("Though appellants style this point of error ... as 'no evidence' and 'insufficient evidence,' the proper standard of review in an appeal from an interlocutory order concerning a motion to stay litigation and compel arbitration is simply 'no evidence.'").

 In performing a "no evidence" review, we consider the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex.2002); *Hearthshire Braeswood*, 849 S.W.2d at 384. Although it is often said that we must disregard all evidence contrary to the finding in question, we need not disregard undisputed evidence that allows of only one logical inference. *St. Joseph Hosp.*, 94 S.W.3d at 519–20.[5]

### Findings Two, Four, and Five

Tri–Star first attacks findings two, four, and five. In finding two, the trial court

5. The scope of review is determined by whether findings of fact were requested and filed. Generally, when findings of fact were not requested or filed, we affirm the trial court's decision if there is evidence to support any legal theory asserted by the prevailing party. *See, e.g., Hearthshire Braeswood*, 849 S.W.2d at 384. But when findings of fact are filed, our review is limited to those findings. *See* TEX.R. CIV. P. 299; *Walnut Equip. Leasing Co. v. J–V Dirt & Loam*, 907 S.W.2d 912, 917 (Tex.App.-Austin 1995, writ denied). Findings of fact must be separately filed and "shall not be recited in a judgment." TEX.R. CIV. P. 299a. In this case, neither party filed a formal request for findings of fact, but the trial court included findings in its order in violation of Rule 299a. It is unclear what effect should be given to findings in this situation. *See id.* (providing that if there is a conflict between findings recited in a judgment and separately filed findings, the separately filed findings control); *In re Castillo*, 101 S.W.3d 174, 179 (Tex.App.-Amarillo 2003, no pet. h.) (holding, where findings of fact were not re-

quested or filed, that the inclusion of findings in the judgment did not foreclose the appellate court's obligation to consider whether the record supported the trial court's decision on other grounds); *Tate v. Tate*, 55 S.W.3d 1, 7 n. 4 (Tex.App.-El Paso 2000, no pet.) (holding that the party who drafted a judgment containing findings of fact waived any complaint about the invalidity of those findings); *Frommer v. Frommer*, 981 S.W.2d 811, 814 (Tex. App.-Houston [1st Dist.] 1998, pet. dism'd) (stating that findings recited in a judgment cannot form the basis of a claim on appeal); *Hill v. Hill*, 971 S.W.2d 153, 157 (Tex.App.-Amarillo 1998, no pet.) (holding that findings in a judgment should be given effect if no one complained of the error and the findings do not conflict with separately filed findings). We need not resolve this question. Even if we limit our review to the grounds for the decision recited in the order, we conclude that the trial court's decision is supported by the evidence. Therefore, we need not consider whether evidence supports any other grounds for the decision.

stated, "Tri–Star engaged in a conscious effort to exclude Tipperary and the Intervenors from knowledge of and access to Ernst & Young Australia." In finding four, the court stated, "Ernst & Young Australia had knowledge of the applicability of the [TAA] to the proceedings, and had legal counsel in Australia to advise of the [TAA's] statutory requirements." And in finding five, the court stated, "Ernst & Young Australia did not comply with the terms of the [TAA]."

■ The record contains the following evidence that supports finding two. On February 5, 1997, Tipperary sent a letter to Tri–Star's president, James Butler, Sr., asking, "Has the 'Big Six' accounting firm been engaged ... ? If not, when will this happen? It has been almost a year since our lawsuit settlement, and we still don't have this accomplished."[6] On February 20, 1997, Tri–Star hired Ernst & Young. The letter of engagement between Tri–Star and Ernst & Young prohibited Ernst & Young from disclosing information about the Comet Ridge Project to third parties without Tri–Star's permission. Tim Eddy, the Ernst & Young partner in charge of this matter, testified that this provision prohibited him from conveying information to Tipperary or the intervenors.

On April 3, 1997, Tri–Star informed Tipperary that it had hired Ernst & Young. On April 9, 1997, Tipperary's counsel complained to Tri–Star's representative that Tipperary had "heard nothing of the activity of Ernst & Young."

In September 1997, Tipperary sent James Sr. a letter, asking why it was not being kept informed about the status of the audit, and Craig, Ltd. sent James Sr. a letter requesting the names and addresses of the Ernst & Young accountants who were doing the work.

In December 1997, counsel for Tipperary and the intervenors requested that Tri–Star's counsel provide the names of the accountants so that they could confer with the accountants about issues they deemed important. Tri–Star's counsel refused, stating, "Tri–Star feels that it would be a breach either of the express or implied terms of the engagement of the auditors to divulge the name of the person doing the work until it is complete." Counsel for Tipperary and the intervenors then sent Tri–Star's counsel a letter stating:

> There is absolutely nothing in the [Mediation] Agreement that would support [Tri–Star's] position. Undoubtedly, there have been communications between Tri–Star employees and the auditor. It seems imminently fair for my clients, since they are paying part of the bill for the auditor, to also have an opportunity to talk to the auditor, if for no other reason, so that they will be confident that when he does render his report it is truly an objective, unbiased report.

Despite Tri–Star's recalcitrance, Tipperary managed to find out the names of the accountants. In May 1998, Tipperary faxed a letter to Ernst & Young, inquiring about the status of the report. Ernst & Young forwarded the letter to James Jr., with a memo stating, "We need to reply to this fax, in light of our previous conversations on these matters, please can you advise us on how to respond." Ernst & Young eventually responded to Tipperary's fax by stating that it was nearing completion of the audit and advising, "Should you have any queries about the recent delays

---

**6.** Butler's son, James Butler, Jr., is the vice-president of Tri-Star. To avoid confusion, we will refer to the Butlers as "James Sr." and "James Jr."

or any other queries please contact Mr. Jim Butler."

In June 1998, Tipperary again requested a status report from Ernst & Young, and Ernst & Young responded by stating, "[W]e have been instructed by Tri–Star that all queries ... should be directed straight to Mr. Jim Butler...."

In September 1998, Tipperary's counsel sent a letter to Ernst & Young requesting that the report be sent immediately, along with an explanation for the delay. James Jr. instructed Ernst & Young to respond to this request "by telling them to get in touch with us." Ernst & Young followed this instruction.

In an effort to explain Tri–Star's refusal to tell Tipperary or the intervenors the names of the accountants, James Sr. testified that it would have been "unusual" to do so in a normal audit situation. He further testified that it would have been "very confusing" to the accountants to have more than one entity communicating with them, and that such communications would have "interfered" with the accountants' work. James Jr. testified that based on his interpretation of the mediation agreement, Tipperary and the intervenors had no right to participate in the process with Ernst & Young. Tipperary's president, on the other hand, testified that he never intended for Tri–Star to participate in Ernst & Young's decision-making process to the exclusion of Tipperary.

Tri–Star argues that the evidence conclusively establishes that none of the parties expected Tipperary and the intervenors to participate in the arbitration process. Tri–Star points out that Tipperary and the intervenors did in fact communicate with Ernst & Young several times, but never requested a hearing or an opportunity to participate. Instead, they were only interested in obtaining Ernst & Young's report. Although there is no evidence that Tipperary or the intervenors requested a hearing, the evidence recounted above, particularly the attorney's December 1997 letters, indicates that they did attempt to participate in the process. The trial court could have inferred from this evidence that "Tri–Star engaged in a conscious effort to exclude Tipperary and the Intervenors from knowledge of and access to Ernst & Young Australia."

■ The record contains the following evidence that supports finding four. Pursuant to the arbitration agreement, Tri Star's representative sent requests for expressions of interest to several accounting firms, including Ernst & Young. The requests quoted the arbitration agreement in its entirety and stated that the accounting services were needed as a result of the mediation agreement. Thus, the requests stated that the accounting firm's determination would be final, binding, and enforceable under " 'the Arbitration Statute of the State of Texas.' " Eddy testified that he was aware that this language was in the arbitration agreement and in the request.

Ernst & Young responded to the request with a written expression of interest that referenced the mediation agreement. After Ernst & Young had been working on the report for over a year, Tri–Star began to question whether Ernst & Young had correctly interpreted the arbitration agreement. Ernst & Young therefore asked an Australian law firm to determine its proper interpretation. After reviewing the mediation agreement, the law firm advised Ernst & Young on the proper interpretation and noted "that the Mediation Agreement is expressed to be governed by the laws of the State of Texas." This evidence is sufficient to support the trial court's finding that Ernst & Young knew the TAA

applied to the proceedings and that it had Australian counsel to advise of the TAA's requirements.

■ As for finding five, we noted in *Tri–Star I* that it is undisputed that Tipperary was not afforded a hearing, an opportunity to present evidence, or other rights guaranteed by the TAA. 2001 WL 175533, at *2 n. 4; *see also* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.043–.051 (Vernon Supp.2003). Indeed, Tri–Star stipulated before the trial court that Ernst & Young did not conduct a hearing. The evidence is thus sufficient to support the court's finding that Ernst & Young did not comply with the TAA.

Tri–Star argues that findings four and five are correct only when viewed with the benefit of hindsight because at the time Ernst & Young was doing its work, the parties had the common understanding that the procedural requirements of the TAA did not apply.[7] Although there is some evidence to support this argument, the evidence does not negate the evidence that Ernst & Young was aware of the arbitration agreement's provision that its determinations would be enforceable under the TAA. We also note that findings four and five, insofar as they relate only to *Ernst & Young's* conduct, are only marginally relevant to the ultimate issue in this case, *i.e.,* whether *Tri–Star'* s misconduct amounted to a material breach of the arbitration agreement.

### Findings One, Three, and Eight

Next, Tri–Star attacks findings one, three, and eight. Finding one is "Tri–Star engaged Ernst & Young Australia not as a neutral arbitrator, but in the capacity as its own accounting firm." Finding three is "Ernst & Young Australia acted in strict loyalty to Tri–Star, acknowledging their roles as client and accountant." And finding eight is "Tri–Star exercised undue influence over the role of Ernst & Young Australia as a neutral arbitrator, substantially affecting the objectivity of the auditing methods and the final report."

■ Regarding findings one and three, we have already noted that Ernst & Young followed Tri–Star's instructions on how to respond to requests for information from Tipperary and the intervenors. This indicates that Ernst & Young considered Tri Star to be its sole client. This interpretation is confirmed by Eddy, who testified that Ernst & Young viewed its relationship with Tri–Star as one of accountant and client. Another Ernst & Young accountant testified that "[o]ur engagement from an ethical point of view was with Tri–Star."

■ To evaluate finding eight, it is necessary to review the process through which Ernst & Young developed its report. In its expression of interest, Ernst & Young noted that it believed the arbitration agreement was open to interpretation. It therefore provided the following explanation of how it interpreted the agreement:

> Paragraph 7B uses the phrase ". . . international accounting procedure forms . . .". From our discussions we understand that the word "forms" appears to be a direct quote from the AIPN Model Form International Accounting Procedure. Whilst we appreciate that this is a specific document, we believe that the spirit of this paragraph will involve us looking beyond "pro forma documents" and drawing on our experience as well

---

7. Tri–Star does not challenge the trial court's determination that the TAA's procedural requirements apply to the arbitration agreement. In its brief, it expressly accepts this determination.

as the written documents used by our own clients on a local and international basis ....

Paragraph 7C asks us to "Select an international accounting procedure ...". We have interpreted this to mean that "we will need to prepare an appropriate document based on the results of 7B (rather than simply selecting one of a number of pro forma documents) which will be used as a supplement to the operating Agreement."

The letter of engagement incorporated by reference this interpretation of the arbitration agreement. By the time the letter was drafted, Ernst & Young had determined that the only international accounting form for oil and gas operations was one developed by the Association of International Petroleum Negotiators. The parties refer to this form as the "AIPN."

In accordance with the letter of engagement, Ernst & Young began creating a supplement to the Comet Ridge operating agreement. This supplement would then enable Ernst & Young to determine which expenses Tri–Star had properly charged to the joint account. The record contains ample evidence that representatives of Tri–Star, including the Butlers, had substantial input in the development of the supplement and in Ernst & Young's decisions about which expenses were properly chargeable to the joint account. In some cases, Ernst & Young adopted Tri–Star's proposed rewrites of the supplement.

Eddy testified that Tri–Star urged Ernst & Young to adopt a broad definition of what could be charged to the joint account. James Jr. admitted that he attempted to convince Ernst & Young that certain categories of expenses, such as marketing, should be charged to the joint account.

Tri–Star also urged Ernst & Young to evaluate not only whether the expenses Tri–Star had already charged to the joint account were proper, but also whether Tri–Star could have charged additional expenses to the joint account. Believing that this was an incorrect interpretation of the arbitration agreement, Eddy consulted Ernst & Young's Australian attorneys about the matter. The attorneys agreed with Eddy that Ernst & Young should only determine whether the expenses that had already been charged were proper. Nevertheless, Eddy acquiesced to Tri–Star's interpretation. Ernst & Young's final report noted that Tri–Star could have charged an additional $260,000 to the joint account. Eddy testified that he did not "recall ... why I got to being able to include [the additional expenses] in my report."

After working on the supplement for over a year, Ernst & Young was ready to release its final report in April 1998. That month, James Sr. contacted one of the Ernst & Young accountants to complain that the proposed final report disallowed too many of the expenses Tri–Star had charged to the joint account. During this conversation, James Sr. informed the accountant that he believed Ernst & Young should not have created a supplement to the operating agreement. Instead, he argued that the arbitration agreement required Ernst & Young to select an already existing form.

Shortly after this conversation, James Jr. forwarded to Ernst & Young a written opinion on this issue from Tri–Star's Texas attorneys. The Texas attorneys agreed with James Sr. that Ernst & Young should have selected a form instead of creating its own supplement. In his cover letter to Ernst & Young, James Jr. suggested that there could be serious repercussions for Ernst & Young if it failed to adopt this interpretation of the arbitration agreement. The letter stated that the Texas

attorneys were "concerned that [Ernst & Young's report] does not satisfy the specific language of the Mediation Agreement.... We have been further advised that failure to follow the Court-sanctioned agreement could be seen by the Court as an action by Tri–Star and Ernst & Young in contempt of the Court's own order."

The Ernst & Young accountants believed that they had acted appropriately in creating a supplement for several reasons. James Jr. had signed the letter of engagement, which incorporated Ernst & Young's interpretation of the arbitration agreement. Moreover, considering Tri–Star's substantial involvement in the creation of the supplement, the accountants believed that it should have been obvious to Tri–Star that Ernst & Young had been creating a supplement for the past year. The accountants had spent a great amount of time doing benchmarking studies, as required by the arbitration agreement, to determine how other entities dealt with the issues covered by the arbitration agreement. The accountants testified that there was no reason for them to do the benchmarking studies if they were simply going to adopt the only existing form, the AIPN. The accountants also testified that they did not believe the AIPN was an appropriate form for the Comet Ridge Project. The arbitration agreement specifically directed them to select an accounting procedure to supplement the "direct charges" provisions of the operating agreement. The AIPN, however, contained no definition of what should be a "direct charge."

Ernst & Young consulted with its Australian attorneys to determine how it should proceed in light of Tri–Star's eleventh hour claim that it had misinterpreted the arbitration agreement. The Australian attorneys issued a written opinion, stating that Ernst & Young had "properly performed its obligations" and that "the terms of the engagement entitle[d] [Ernst & Young] to give a more liberal and practical approach to the [arbitration agreement] than the stricter interpretation now required by Tri–Star Petroleum." Nevertheless, because the arbitration agreement was "ambiguous and disjointed" and "[i]n view of [its] litigious background," the Australian attorneys concluded that it should be strictly construed to require Ernst & Young to select an existing form, rather than to create a supplement. The Australian attorneys stressed, "It is ... important to note that the Mediation Agreement is expressed to be governed by the laws of the State of Texas and therefore the opinion of the Texas Attorneys should be deferred to on matters of legal interpretation." Based on this advice, Ernst & Young agreed to scrap the supplement that it had been developing for over a year and to adopt the AIPN.

In their written opinion, the Texas attorneys stated that if Ernst & Young created a supplement rather than adopting an existing form, "the settling parties may well argue that [creating the supplement] was not within the mandate" of the arbitration agreement. It is undisputed that neither Ernst & Young nor Tri–Star contacted any of these "settling parties," such as Tipperary, to determine if their interpretation of the arbitration agreement jibed with that of Tri–Star's Texas attorneys.

The testimony of the Ernst & Young accountants indicates that adoption of the AIPN was favorable to Tri–Star. For example, pursuant to the supplement they created, time spent on administrative work was not always billed to the joint account. But under the AIPN, all of this time could be billed to the joint account. As of March 1998, just before it was about to issue its final report, Ernst & Young had determined that Tri Star inappropriately

charged approximately $132,000 to the joint account. But the final report that was actually released in October 1998, after Ernst & Young adopted the AIPN, concluded that Tri–Star had inappropriately charged only $7,700. And as noted above, Ernst & Young also concluded in the final report that Tri–Star could have charged an additional $260,000 to the joint account.

From this evidence, the trial court could have inferred that Tri–Star not only supplied Ernst & Young with the raw data that it needed to complete its report, but also attempted to influence Ernst & Young's decisions. The evidence also reflects that Tri–Star was successful in changing Ernst & Young's decisions on some crucial issues. The court could have inferred that Tri–Star's influence was "undue" in light of Tri–Star's efforts to shut Tipperary and the intervenors out of Ernst & Young's decision-making process and in light of James Sr.'s own testimony that Ernst & Young was acting in a "judgmental capacity and shouldn't be interfered with . . . [b]y anybody."

Tri–Star argues that Ernst & Young conducted a rigorous and fair evaluation and that it exercised its independent judgment. Tri–Star points out that Ernst & Young challenged many of the expenses charged to the joint account. The final report disallowed some of these expenses, and Tri–Star withdrew others as a result of Ernst & Young's questions. Both the Ernst & Young accountants and a CPA who evaluated their work testified that Ernst & Young exercised independent professional judgment. Tri–Star also notes that Ernst & Young contacted its own counsel before deciding to abandon the supplement and adopt the AIPN. And Tri–Star argues that as a small, family-owned company, it was in no position to exercise undue influence over Ernst & Young,

which was a Big Six accounting firm. Nevertheless, the evidence recited above is more than sufficient to support findings that "Tri–Star engaged Ernst & Young Australia not as a neutral arbitrator," that Ernst & Young acted in loyalty to Tri–Star, and that "Tri–Star exercised undue influence" over Ernst & Young, "substantially affecting the objectivity of the auditing methods and the final report."

### Findings Nine and Ten

Tri–Star next argues that the evidence does not support findings nine and ten. In finding nine, the trial court stated, "Not only was the neutrality of the arbitration proceeding adversely affected by Tri–Star, but the efficacy of the entire process of [the arbitration agreement] was irretrievably compromised by Tri–Star's conduct." In finding ten, the court stated, "Tipperary was deprived of the benefits it reasonably expected would flow from a valid arbitration procedure—resolution of the billing disputes."

■ The evidence that supports the findings of undue influence and exclusion of others from the arbitration process also supports a finding that the efficacy of the process was irretrievably compromised. And the fact that Ernst & Young's report had to be vacated supports the finding that Tipperary was deprived of a resolution of the disputes.

■ One of the factors that a court may consider in determining the materiality of a breach is the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance. *Hernandez*, 875 S.W.2d at 693; RESTATEMENT (SECOND) OF CONTRACTS § 241(a) (1981). Tri–Star argues that because the trial court has determined that the TAA's procedural requirements apply to the arbitration agreement, re-arbitration would

secure for Tipperary the benefit it reasonably anticipated from the arbitration agreement, *i.e.,* a fair resolution of the billing disputes. Tri–Star also notes that Tipperary has already received other benefits from the mediation agreement, such as the cure of the forfeiture of interest that Tri–Star asserted against Tipperary in the suit that resulted in the mediation agreement.

Tipperary's president testified that he entered into the arbitration agreement because he believed it would lead to an impartial, speedy, and inexpensive resolution of the controversy. Now, more than six years and two appeals later, the underlying controversy is still not resolved. Tri–Star did not send the requests for expressions of interest to the Big Six accounting firms until over eight months after the mediation agreement was signed. Although Ernst & Young estimated that it would take just over two months to issue its final report, it actually took more than a year and a half. At least part of this delay was attributable to the fact that Tri–Star initially went along with Ernst & Young's decision to develop a supplement, but then insisted that Ernst & Young adopt the AIPN just as Ernst & Young was about to issue its final report. Tipperary's president testified that it was important to Tipperary to resolve the controversy quickly for budgeting and planning purposes. He also testified that the protracted nature of the controversy complicated Tipperary's reports to the SEC, lenders, and investors.

Tipperary has paid Ernst & Young over $75,000. Tipperary's president estimated that in addition to Ernst & Young's fees, Tipperary had spent over one million dollars in trying to resolve the disputes encompassed by the arbitration agreement. From all this evidence, the trial court could have inferred that the efficacy of the arbitration process had been irretrievably compromised and that it is now impossible for Tipperary to obtain the benefit it reasonably anticipated from the arbitration agreement—a speedy and inexpensive resolution of the controversy.

### Findings Six and Seven

■■■■■ Tri–Star argues that findings six and seven are irrelevant. In finding six, the trial court stated, "The arbitration process was extremely long, costly and inefficient." And in finding seven, the trial court stated, "Valuable productive time in the drilling program was lost because of the flawed arbitration process." Tri–Star notes that whenever an arbitration award is vacated, there will inevitably be additional delays, costs, and inefficiencies. We agree that mere delay, cost, and inefficiency alone do not justify a court in refusing to enforce an arbitration agreement. Here, however, the extent of the delay, cost, and inefficiency is a result of Tri–Star's misconduct. We therefore conclude that findings six and seven are relevant.

Tri–Star's second issue is overruled.

### RULING ON THE POST–1995 DISPUTES

■■■ In its order, the trial court refused to compel arbitration of the post–1995 disputes. Tri–Star argues in its third issue that the court erred by ruling on these disputes because the only issue before the court was Tri–Star's motion to compel re-arbitration of the 1994–95 disputes. But as Tri–Star acknowledges, arbitration of the post 1995 disputes is dependent upon a determination of the 1994–95 disputes, and the post–1995 disputes are not ripe for decision unless and until there has been another arbitration of the 1994–95 disputes. Pursuant to the trial court's order, there will not be another arbitration of the 1994–95 disputes. Consequently, there can be no arbitration of

**624**

the post–1995 disputes. We therefore conclude that the trial court did not err by ruling on the post 1995 disputes.

Tri–Star's third issue is overruled.

## CONCLUSION

For the reasons stated herein, the order of the trial court is affirmed.